**In re ESTATE OF William O. SMALING a/k/a William Smaling, Deceased.**

**Appeal of Norine C. Smaling.**

Superior Court of Pennsylvania.

Argued April 9, 2013.

Filed Nov. 12, 2013.

---

1. This conclusion renders Appellants' second issue moot.

Todd W. Weitzman, Stroudsburg, for appellant.

David L. Horvath, Stroudsburg, for appellee.

Robert L. Byer, Pittsburgh, for PA Bar Association, participating party.

BEFORE: STEVENS, P.J.*, FORD ELLIOTT, P.J.E., BOWES, J., GANTMAN, J., PANELLA, J., SHOGAN, J., LAZARUS, J., MUNDY, J., and OTT, J.

* President Judge Stevens did not participate in

OPINION BY LAZARUS, J.

Norine C. Smaling ("Norine") appeals from the decree entered in the Court of Common Pleas of Monroe County, directing that a will dated April 11, 2005 be probated as the Last Will and Testament of William O. Smaling, a/k/a William Smaling ("Decedent"). Upon a careful review of the record in this matter, we conclude that the Orphans' Court erred in finding that Decedent lacked testamentary capacity on the date he executed his 2008 will. However, because we find no error of law or abuse of discretion in the court's finding of undue influence, we affirm the court's decree.

Decedent died on December 31, 2009, a resident of Chestnuthill Township, Monroe County, survived by his second wife of approximately twelve years, Norine, as well as two adult sons, William O. Smaling, Jr. ("William") and Wayne Smaling ("Wayne"). On January 22, 2010, a document dated April 11, 2005 ("2005 will") was admitted to probate by the Monroe County Register of Wills as the Decedent's Last Will and Testament. Letters Testamentary were granted to William, the executor named therein. Under the terms of the 2005 will, Decedent gave a specific bequest of $35,000 to Norine and left the residue of his estate to his sons in equal shares.

On March 3, 2010, Norine filed a petition seeking to probate an after-discovered will dated October 29, 2008 ("2008 will"), in which Decedent left his entire estate to Norine and named her as executrix. The 2008 will also names Norine's son (Decedent's stepson) as contingent beneficiary and alternate executor. On April 9, 2010, the Register of Wills certified the record to the Orphans' Court Division of the Court of Common Pleas of Monroe County for adjudication. The Orphans' Court is-

the consideration or decision of this case.

sued a citation directed to William, the proponent of the probated 2005 will, to show cause why the 2008 will should not be admitted to probate.

On April 29, 2010, William filed a response to Norine's petition in which he asserted that the 2008 will was the product of undue influence practiced upon Decedent by Norine and that Decedent lacked testamentary capacity at the time of the will's execution. Norine filed a motion for summary judgment, which was denied by order dated July 5, 2011. On October 27, 2011, the Orphans' Court held a hearing at which William, Wayne and Norine testified, as well as Decedent's former brother-in-law, Frank Papson. Deposition testimony of Maggi Khalil, Esquire, the scrivener of the will, William Fort, a witness to the execution of the 2008 will, and Dr. K.R. Wignarajan, Decedent's treating physician, were also entered into evidence.

On November 18, 2011, the Orphans' Court issued an opinion and decree denying Norine's petition and directing that the 2005 will be probated as Decedent's Last Will and Testament. The court found that Norine had exercised undue influence upon Decedent and that Decedent did not possess the requisite testamentary capacity at the time he executed his 2008 will.

Norine filed a timely notice of appeal to this Court on December 14, 2011 and a court-ordered statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b) on January 4, 2012. The Orphans' Court filed a Rule 1925(a) statement on January 23, 2012, in which it did not specifically address the issues raised by Norine in her Rule 1925(b) statement, but rather noted that the original judge as-

signed to the case, the Honorable Linda Wallach Miller, had retired, and submitted Judge Miller's November 18, 2011 opinion in support of affirmance. On appeal, Norine raised, *inter alia*, several claims related to the weight of the evidence. After oral argument, this Court issued an opinion, since withdrawn, in which we concluded that Norine had waived her appellate weight claims because she failed to preserve them by filing exceptions pursuant to Pa.O.C.R. 7.1.

On July 20, 2012, Norine filed for reargument pursuant to Pa.R.A.P. 2541. In her petition for reargument, Norine claimed that the panel erred by interpreting Rule 7.1 to require the filing of exceptions where a weight-of-the-evidence claim is raised. She also asserted that, regardless of the panel's interpretation of Rule 7.1, her weight claims were preserved by virtue of their inclusion in her Rule 1925(b) statement. Finally, she alleged that the panel erred by finding all of her issues waived because there were properly preserved, non-weight-related claims that could and should have been addressed on their merits.

By order dated September 7, 2012, this Court granted *en banc* reargument, withdrew our prior decision filed on July 10, 2012,[1] and ordered the parties to file briefs specifically addressing the issue of waiver, in addition to the issues originally presented on appeal.

In her substituted brief, Norine raises the following issues for our review:

1. Did the Superior Court panel opinion err in holding that the issues on

---

1. We refer herein to the now-withdrawn panel decision only insofar as the first issue raised by the appellant on reconsideration, that of waiver, was raised for the first time *sua sponte* by the panel and was found to be

dispositive of all issues raised before the panel. On that limited issue, we are technically reviewing the decision of the panel and not that of the Orphans' Court.

appeal were waived for non-compliance with Pa.O.C.R. 7.1?

2. Did the [Orphans' Court] abuse its discretion and commit an error of law by failing to apply the proper standard of review?

3. Did the [Orphans' Court] abuse its discretion because its factual findings do not support a finding of testamentary capacity?

4. Did the [Orphans' Court] abuse its discretion by misstating and then relying upon a critical evidentiary fact concerning an element of undue influence?

5. Did the [Orphans' Court] abuse its discretion and commit an error of law by failing to give due consideration to the testimony as a whole and the interest of the witnesses?

Substituted Brief of Appellant, at 4 (renumbered for ease of disposition).

 We begin with Norine's first claim, addressing the issue of waiver. The panel concluded, having raised the issue *sua sponte*, that Norine had waived all of her issues on appeal for failure to preserve them through the filing of exceptions. Orphans' Court post-trial practice is governed by Pa.O.C.R. 7.1, which provides, in relevant part, as follows:

(a) General Rule.... [N]o later than twenty (20) days after entry of an order, decree or adjudication, a party **may** file exceptions to any order, decree or adjudication which would become a final appealable order under Pa.R.A.P. 341(b) or Pa.R.A.P. 342 following disposition of the exceptions.... **Failure to file exceptions shall not result in waiver if the grounds for appeal are otherwise properly preserved.**

Pa.O.C.R. 7.1(a) (emphasis added). The panel concluded that, although the filing of exceptions is optional under Rule 7.1 ("a party may file exceptions"), issue preservation is not (no waiver for failure to file, but only "if the grounds for appeal are otherwise properly preserved"). Pa.O.C.R. 7.1. Thus, the panel interpreted Rule 7.1 to mean that exceptions are mandatory in those instances where a claim has not been preserved before the trial court through objection, motion or otherwise. Because Norine raised weight-of-the-evidence claims, and such claims, by their nature, can only arise after the court issues its final decision in a matter, the panel concluded that she was required to preserve the claims by filing exceptions. Having failed to do so, Norine's claims were deemed waived and the decree of the Orphans' Court was affirmed. For the following reasons, we disagree with the panel's conclusions.

 Appellate review of weight of the evidence claims is limited. It is well-settled that:

[a]ppellate review of a weight claim is a review of the [trial court's] exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

*Commonwealth v. Clay*, 64 A.3d 1049, 1055 (Pa.2013) (internal citations omitted). Accordingly, there is a general rule barring appellate review of weight claims in the

first instance. *Armbruster v. Horowitz*, 572 Pa. 1, 813 A.2d 698, 703–04 (2002). As such, where an appellant fails to raise a weight claim before the trial court, thus preventing it from addressing the claim from the vantage point of having presided over the trial, the claim is unreviewable on appeal.

Here, we are presented with a scenario in which neither the applicable Orphans' Court procedural rule, nor case law interpreting it, explicitly requires the filing of post-trial motions to preserve claims for appellate review.[2] The appellant raised weight claims, not in post-trial motions, but in a court-ordered Rule 1925(b) statement. Under normal circumstances, this should have been sufficient to give the Orphans' Court an opportunity to review the claim in the first instance. However, in this case, by the time Norine filed her timely notice of appeal and Rule 1925(b) statement, the trial judge, the Honorable Linda Wallach Miller, had retired from the bench. Accordingly, in response to Norine's Rule 1925(b) statement, the newly assigned judge, the Honorable Arthur L. Zulick, simply issued a brief statement relying on Judge Miller's earlier opinion, which had not addressed Norine's weight claim. As such, the presiding trial judge did not, and will never be able to, address those claims.

Our Supreme Court's holding in *Commonwealth v. Widmer*, 547 Pa. 137, 689 A.2d 211 (1997), is instructive here. In *Widmer*, the Court was confronted with the question of whether a weight claim not raised in then-optional post-sentence motions,[3] but nevertheless raised in a Rule 1925(b) statement and thoroughly addressed by the trial court in its Rule 1925(a) opinion, was preserved for appellate review. In holding that the appellant had preserved the issue despite his failure to file optional post-sentence motions, the Court observed the following:

The issue under consideration—the weight of the evidence—is an exceptional issue which is unlikely to be preserved for appeal without the filing of a post-sentence motion. Thus, the option of

---

**2.** In cases governed by the Rules of Civil Procedure, weight of the evidence claims must be preserved by being raised in post-trial motions. *See Criswell v. King*, 575 Pa. 34, 834 A.2d 505 (2003). In such cases, Pa. R.C.P. 227.1 governs post-trial motions, which have been held by our Supreme Court to be mandatory if a litigant wishes to preserve issues for appellate review; if an issue has not been raised in a post-trial motion, it is waived for purposes of appellate review. *See L.B. Foster Co. v. Lane Enters.*, 551 Pa. 307, 710 A.2d 55 (1998) (*per curiam* ).

In criminal cases, preservation of weight claims is governed by Pa.R.Crim.P. 607(A), which provides as follows:

(A) A claim that the verdict was against the weight of the evidence shall be raised with the trial judge in a motion for a new trial:

(1) orally, on the record, at any time before sentencing;

(2) by written motion at any time before sentencing; or

(3) in a post-sentence motion.

Pa.R.Crim.P. 607(A). In the criminal context, where the rules explicitly require weight claims to be raised in post-sentence motions, our Supreme Court has held that the inclusion of a weight claim in an appellant's Rule 1925(b) statement did not preserve his weight of the evidence claim for appellate review in the absence of an earlier motion, even where the trial court addressed the appellant's weight claim in its Pa.R.A.P. 1925(a) opinion. *Commonwealth v. Sherwood*, 603 Pa. 92, 982 A.2d 483 (2009).

**3.** *Widmer* was decided under former Rule of Criminal Procedure 1410 B.(1)(c), which provided, in relevant part:

Issues raised before or during trial shall be deemed preserved for appeal whether or not the defendant elects to file a postsentence motion on those issues.

*Widmer*, 689 A.2d at 212, quoting former Pa. R.Crim.P. 1410 B.(1)(c).

forgoing a post-sentence motion and proceeding directly to the Superior Court, as permitted by Rule 1410, may not preserve the issue for appeal. Nevertheless, ... the trial court ... reviewed the weight of the evidence claim prior to the Superior Court's review, and clearly held that the verdict was in fact contrary to the weight of the evidence. Therefore, the precept ... that a weight of the evidence claim must be addressed in the first instance by the trial court has been met. There was no need for the Superior Court to review a cold record and make an initial determination concerning the weight of the evidence[.] That being the case, it was error for the Superior Court ... to rule that appellant's failure to file a post-sentence motion for a new trial had the effect of waiving his claim that the verdict was contrary to the weight of the evidence.

*Id.* Accordingly, the Supreme Court instructed this Court to remand the case to the trial court to allow the appellant to file a nunc pro tunc motion for a new trial, challenging the weight of the evidence.[4]

Here, as in *Widmer*, we are confronted with a situation in which the applicable procedural rule—in this case Pa.O.C.R. 7.1—does not require the filing of post-trial motions; nor does it specifically require weight of the evidence claims to be raised via post-trial motions. Also similarly, the issue requiring preservation is a weight claim, an "exceptional issue which is unlikely to be preserved for appeal without the filing of a post-sentence motion." *Id.* Like former Rule 1410, Rule 7.1 specifically notes that issues preserved before or during trial are not waived for failure to do so. Similarly, both rules are silent as to the manner in which weight of the evidence claims are to be preserved. Thus, although *Widmer* did not involve Rule 7.1, we conclude that the Court's rationale in interpreting former Rule 1410 applies here. Thus, by raising her weight claim in a timely-filed Rule 1925(b) statement, Norine successfully preserved the issue for appellate review.

Our inquiry does not, however, end here. Our disposition of this case is complicated by the fact of Judge Miller's retirement. In *Widmer*, the trial court had, in fact, addressed the appellant's weight claim in its Rule 1925(a) opinion. Here, however, Judge Miller retired before she was able to address Norine's weight claim. Thus,

---

4. In a concurring opinion, Justice Cappy stated that he would have "specifically direct[ed] that the Criminal Rules Committee amend Rule 1410 as soon as practical to explicitly provide for weight of the evidence challenges." *Widmer*, 689 A.2d at 213 (Cappy, J., concurring). Justice Cappy noted:

[C]hallenges to the weight of the evidence can never be raised "before or during trial;" rather such challenges can only be raised after trial. Thus, there is [a] clear void in new rule 1410; a void which I believe was unintentional and one which the ... Committee must address. The fact that the trial court in the instant case addressed the challenge to the weight of the evidence in its opinion filed pursuant to Pa.R.A.P. 1925 simply does not cure the deficiency in new rule 1410 since there [likely] will be times where, under similar

circumstances, the trial court will either review such a challenge in its rule 1925 opinion in a cursory fashion or even fail to address such a challenge at all. Certainly, given the language of rule 1410 as it now stands, a defendant caught in those circumstances should not be denied his or her right to challenge the weight of the evidence any more than the defendant in the instant matter should. At the very least, Rule 1410 should specifically state that challenges to the weight of the evidence must be raised first in the trial court or else those challenges will be deemed waived. *Id.* We believe that a similar review of Rule 7.1 by the Orphans' Court Rules Committee, clarifying the procedure for weight claims in Orphans' Court appeals, is now in order to prevent future confusion.

were we to remand the case with instructions to the Orphans' Court to review Norine's weight claims, the newly-assigned judge would be reviewing a cold record. However, we do not believe that Norine should be denied appellate review of her weight claims for reasons which were beyond her control.

■ Our Supreme Court, in *Armbruster, supra,* addressed the question of whether an appellate court may review a properly preserved weight claim where the judge who presided over the trial resigned from the bench without ruling on the claim in the first instance. After considering the available options in light of the interests of judicial economy and fairness to appellate litigants, the Court concluded that, "where a properly preserved weight of the evidence claim is raised on appeal and the judge who presided at trial failed to rule on the claim and is now permanently unavailable to do so, the claim must be reviewed by the appellate tribunal in the first instance." *Armbruster,* 813 A.2d at 705. Accordingly, because Norine properly preserved her weight claim and Judge Miller is permanently unavailable to review it, we will do so here.

■ Norine's second claim is that the Orphans' Court abused its discretion and committed an error of law by failing to apply the proper standard of review. Norine claims that, while the court cited the proper burden-shifting standard in its opinion, it failed to actually apply that standard in practice. We find this claim to be without merit.

■ We begin by noting:

In a will contest, the hearing judge determines the credibility of witnesses. The record is to be reviewed in the light most favorable to appellee, and review is to be limited to determining whether the trial court's findings of fact were based upon legally competent and sufficient evidence and whether there was an error of law or abuse of discretion.

*Estate of Reichel,* 484 Pa. 610, 400 A.2d 1268, 1269–70 (1979).

■ "The resolution of a question as to the existence of undue influence is inextricably linked to the assignment of the burden of proof." *In re Estate of Clark,* 461 Pa. 52, 334 A.2d 628, 632 (1975). Once the proponent of the will in question establishes the proper execution of the will,[5] a presumption of lack of undue influence arises; thereafter, the risk of non-persuasion and the burden of coming forward with evidence of undue influence shift to the contestant. *Id.* The contestant must then establish, by clear and convincing evidence, a *prima facie* showing of undue influence by demonstrating that: (1) the testator suffered from a weakened intellect; (2) the testator was in a confidential relationship with the proponent of the will; and (3) the proponent receives a substantial benefit from the will in question. *Id.* Once the contestant has established each prong of this tripartite test, the burden shifts again to the proponent to produce clear and convincing evidence which affirmatively demonstrates the absence of undue influence. *Id.*

Here, the parties stipulated to the proper execution of the will. As such, risk of

---

5. *See In re Cohen Will,* 445 Pa. 549, 284 A.2d 754, 755 (1971) (execution of a will proved by required two witnesses). The burden may also be shifted by proving the formalities of probate. However, here, the after-discovered 2008 will was never admitted to probate by the register. Rather, the register immediately certified the case to the Orphans' Court Division. Accordingly, the proponent's initial burden was satisfied by proof of proper execution of the will pursuant to 20 Pa.C.S.A. § 2502. Here, the parties stipulated to the proper execution of the 2008 will.

non-persuasion and the burden of coming forward with evidence of undue influence immediately shifted to William as the contestant. *See id.* In its opinion, the Orphans' Court reviewed the testimony presented at trial, as well as the deposition transcripts entered into evidence, and concluded that the testimony of William's witnesses was credible, while Norine's testimony was not. *See* Trial Court Opinion, 11/18/11, at 8 ("[Norine's] testimony was inconsistent with that of the other witnesses and we did not find her credible."). Norine's testimony was the sole evidence presented in support of the validity of the 2008 will as related to the claim of undue influence. Thus, while the court did not explicitly explain its burden-shifting analysis, the fact that the court found Norine's testimony incredible implicitly means that it concluded that Norine had failed to prove, by clear and convincing evidence, the absence of undue influence. *Clark, supra.* As such, we do not find the court's failure to engage in a written burden-shifting analysis fatal to its decision. Accordingly, this claim is meritless.

We will address Norine's issues numbered three and four together. Norine claims that the factual findings of the Orphans' Court do not support findings of testamentary incapacity and undue influence, especially where the court relied on a mistake of fact in arriving at its decision.

In his response to Norine's petition to probate an after-discovered will, William alleged, and the Orphans' Court ultimately found, that: (1) Decedent lacked testamentary capacity on the date he executed his will; and (2) Decedent's 2008 will was the product of undue influence exercised upon him by Norine.

Testamentary capacity exists when the testator has intelligent knowledge of the natural objects of his bounty, the general composition of his estate, and what he or she wants done with it, even if his memory is impaired by age or disease. *Brantlinger Will,* 418 Pa. 236, 210 A.2d 246 (1965). "Neither old age, nor its infirmities, including untidy habits, partial loss of memory, inability to recognize acquaintances, and incoherent speech, will deprive a person of the right to dispose of his own property." *Estate of Hastings,* 479 Pa. 122, 387 A.2d 865, 868 (1978), citing *Aggas v. Munnell,* 302 Pa. 78, 152 A. 840, 843 (1930). In determining testamentary capacity, a greater degree of proof of mental incapacity is required than would be necessary to show the inability to conduct one's business affairs. *In re Estate of Ziel,* 467 Pa. 531, 359 A.2d 728, 731–32 (1976) (citation omitted). Finally, testamentary capacity is to be ascertained as of the date of execution of the contested document. *Id.* at 732 (citation omitted).

Here, the court found that Decedent began showing signs of confusion and failed to recognize family and friends as early as 2006. According to William's testimony, which the court found very credible, Decedent failed to recognize William when talking over Skype in 2006;[6] Norine needed to remind Decedent whose face was on the computer screen. William also testified that Decedent did not recognize him when William picked Decedent and Norine up at Newark Airport. Decedent refused to get into William's car until Norine explained that the car belonged to his son. Moreover, William, Frank Papson and Wayne all testified that Decedent did not recognize them at the viewing for Decedent's former brother-in-law, Ronald Papson in April 2008. Wayne testified

---

**6.** William and Norine lived primarily in the Netherlands and would visit the U.S. approximately every six months. *See* N.T. Trial, 10/27/11, at 9.

that, when he approached Decedent at the viewing, Decedent actually introduced himself to Wayne.

William submitted the deposition transcript of Decedent's primary care doctor, Kanagarayer R. Wignarajan, M.D. Decedent was under Dr. Wignarajan's care when in the U.S. from 1997 until his death in 2009. Doctor Wignarajan testified that Decedent first complained of "[d]ecreased memory" in April 2005. Wignarajan Deposition, 10/19/11, at 10. Later, when asked whether he noticed any changes in Decedent's mental condition between 1997 and 2008, Dr. Wignarajan testified as follows:

A: Yes. His memory was not the same at the time that I saw him later in life. His ability to respond to most questions was negative. So, his memory was bad and I would say that quote-unquote these are symptoms of dementia.

*Id,* at 16. After an appointment with the Decedent on October 24, 2008—five days prior to the execution of the 2008 will—Dr. Wignarajan noted in his records a diagnosis of organic brain syndrome, or dementia. Dr. Wignarajan testified that Decedent had not been able to "respond appropriately" to questions, *id.* at 18., and, to a reasonable degree of medical certainty, was likely to have been in "late stage dementia" at that time. *Id,* at 20. When asked, Dr. Wignarajan opined that, as of October 24, 2008, Decedent "could not have known the value of anything he had" as far as property, bank accounts, investments or other holdings. *Id,* at 26.

The deposition testimony of the scrivener of the 2008 will, Attorney Khalil, was also submitted into evidence. Attorney Khalil testified that, prior to meeting with the Smalings, she consulted with an experienced attorney-mentor, Eloisa Castillo, Esquire, who Attorney Khalil stated had served on the New Jersey Ethics Board.

Attorney Khalil consulted with Attorney Castillo and others regarding, among other things, the fact that she would need to make clear to the Smalings that Decedent, and not Norine, was her client. They also spoke of the need to ensure that Decedent was capable of executing a will.

Attorney Khalil testified that, while Norine did almost all of the talking, Decedent "seemed to be aware, to be understanding and to be in agreement with what she was saying." Khalil Deposition, 3/23/11, at 32. After asking Norine to leave the room, Attorney Khalil asked Decedent questions such as the date, the year and his name, in an effort to determine whether he was sufficiently oriented. Although he had difficulty hearing the questions, he ultimately answered them all correctly. *See id,* at 35. Attorney Khalil also asked him "substantial questions about the will" such as whether he wished to leave everything to Norine. *Id.* She testified as follows:

Q: So how did you go through and confirm what he wanted? Tell us about how you did that.

A: I had to identify his immediate family members. And I asked him about his parents who, you know, no surprise, were deceased. And I noted that in the will. I asked him about his children. And he mentioned his son William Smaling, Jr. And I collected his date of birth from him, and put that information in the will as well. He also gave me the name of another son, and I placed that information in the will. And his wife had mentioned her son, which she had stated was a better son to him than his own sons. And they had discussed this. And he wanted for this stepson to be in the will. So that was something I also went over with him. And he said that that was fine. He said yes. And I identified him as also a family member.

. . .

Q: Did you speak with him generally about what he wanted to do with his estate and property?

A: I did.... [I]t was relatively easy, you know, anything I have I want to leave to my wife. And, basically, you know, she was also going to be named the person to take care of this will as the executor.

*Id*, at 38.

Attorney Khalil also took an unusual step to determine if the Decedent was truly in agreement with the proposed estate plan.

Q: On the fourth page of Exhibit A there is, in all caps writing, a paragraph on a single piece of paper which reads as follows: "Mr. Smaling, I want to ask you if you are interested in leaving everything you own to your wife, Norine C. Smaling, the woman seated to your left wearing a red hat."

. . .

A: When I was meeting with Mr. Smaling alone ... due to [his] age and how slow moving he was and even—this is actually jogging my memory more why I wanted to write this note. He had been falling asleep during portions of our conversations. And it wasn't that he was completely becoming unconscious. It was that he was just dozing off. And as a result of that, I felt at time that, you know, perhaps this isn't the best time for him doing this because he was so tired. but he would assure me that he's always like this, and he's an old man, and this was as good a time as any.

Q: So how did you come to prepare this note that I just quoted?

A: So when I was alone with Mr. Smaling I wanted to, you know, for my satisfaction and for my, you know, required diligence, I wanted to confirm that he was in good form to write this will and that he definitely understood what I was saying, because often times he would just say "yes" or "no." Or like I said, he was dozing off. So I ... wrote this note. And I just wanted to make sure, beyond certainty, that this is what he understood. And I felt that also reading it would give him a second, you know, way to confirm what he was about to do. So he read the note out loud. And he nodded his head yes. Norine, yes, that's fine. Everything I have, my wife. And, you know, he confirmed that he wanted to leave everything to her. And he said yes.

. . .

Q: When you gave him this note, was this during the private conversation with him?

A: Yes, it was.

*Id.* at 39–41.

When asked directly whether she had "any doubts in [her] mind that [Decedent] knew what he owned and what he was doing in making a will," Attorney Khalil testified that "[b]y the time [Decedent] signed the document, I had no doubt.... [A]ny doubt I may have had was no longer present by the time he signed the will." *Id.* at 45.

Upon careful review of the record, we feel constrained to conclude that the Orphans' Court erred in finding that Decedent did not possess the requisite capacity to execute his will on the date in question. Because our inquiry must focus on the Decedent's state of mind *on the date the will was executed, Ziel, supra,* Attorney Khalil's deposition testimony is particularly probative. Although it is clear that Decedent suffered from dementia and sometimes had difficulty recognizing even close family members, Attorney Khalil's testimony establishes that, on the date he executed his will, Decedent was aware of

what he was doing.[7] The Orphans' Court clearly found Attorney Khalil's testimony to be credible, having relied upon it extensively in arriving at its decision regarding undue influence. *See* Trial Court Opinion, 11/18/11, at 12. Nonetheless, the court inexplicably chose to ignore her testimony entirely as it pertained to Decedent's testamentary capacity.[8] This failure to consider Attorney Khalil's testimony regarding the will's execution was an abuse of discretion.

Rather than crediting Attorney Khalil's testimony regarding her observations of Decedent on the very date of execution, the Orphans' Court instead relied upon the testimony of Dr. Wignarajan, characterizing his testimony to state that Decedent "was incapable of managing his own affairs, particularly anything of value" as of October 2008. Trial Court Opinion, 11/18/11, at 10. However, a review of Dr. Wignarajan's testimony shows that he was merely speculating that Decedent "could not have known the value of anything he had" although he had not actually asked Decedent any questions about his estate. Wignarajan Deposition, 10/19/11, at 26. Conversely, Attorney Khalil's testimony regarding the Decedent's state of mind was based upon her direct inquiries on the actual date of execution. As the Orphans' Court clearly deemed her testimony credible, we conclude that the Orphans' Court abused its discretion in finding that Decedent lacked testamentary capacity on the date he executed his will.

■ Our inquiry does not end here, however, as William also asserted a claim

of undue influence. Our Supreme Court has defined undue influence as follows:

> The word "influence" does not refer to any and every line of conduct capable of disposing in one's favor a fully and self-directing mind, but to control acquired over another that virtually destroys his free agency.... In order to constitute undue influence sufficient to void a will, there must be imprisonment of the body or mind ... fraud, or threats, or misrepresentations, or circumvention, or inordinate flattery or physical or moral coercion, to such a degree as to prejudice the mind of the testator, to destroy his free agency and to operate as a present restraint upon him in the making of a will.

*Ziel,* 359 A.2d at 733 (citations omitted). A party claiming undue influence must establish, by clear and convincing evidence, that: (1) when the will was executed the testator was of weakened intellect and (2) that a person in a confidential relationship with the testator (3) receives a substantial benefit under the will. *Id.* at 734.

■ We begin by addressing the third prong of the undue influence test, that of substantial benefit. "Substantial benefit" has not been precisely defined in our case law. "[I]ndeed, it may be said no hard and fast rule can be laid down. [The court's finding] must depend upon the circumstances of each particular case." *In re Estate of LeVin,* 419 Pa.Super. 89, 615 A.2d 38, 41 (1992), quoting *Adams' Estate,* 220 Pa. 531, 69 A. 989, 990 (1908).

---

7. We take particular notice of the note written by Attorney Khalil—presented to Decedent at a time when Norine was outside of his presence—confirming Decedent's testamentary intentions.

8. Despite Attorney Khalil's extensive testimony regarding Decedent's capacity on the date of execution, the court inaccurately stated in its opinion that Norine "presented no testimony to convince the [c]ourt" that Decedent possessed testamentary capacity at the time he executed the 2008 will. Trial Court Opinion, 11/18/11, at 11.

Here, it is readily apparent that Norine receives a substantial benefit under the 2008 will. The terms of the probated 2005 will give Norine a specific bequest of $35,000, dividing the residuary estate equally between William and Wayne. In contrast, the 2008 will gives Decedent's entire estate, worth approximately $200,000,[9] to Norine. Accordingly, the substantial benefit prong has been satisfied.

Next, we consider whether Decedent suffered from a weakened intellect. The weakened intellect necessary to establish undue influence need not amount to testamentary incapacity. *Clark*, 334 A.2d at 634. "Although our cases have not established a bright-line test by which weakened intellect can be identified to a legal certainty, they have recognized that it is typically accompanied by persistent confusion, forgetfulness and disorientation." *In re Estate of Fritts*, 906 A.2d 601, 607 (Pa.Super.2006). Moreover, because undue influence is generally accomplished by a gradual, progressive inculcation of a receptive mind, the "fruits" of the undue influence may not appear until long after the weakened intellect has been played upon. *Clark*, 334 A.2d at 634. Accordingly, the particular mental condition of the testator on the date he executed the will is not as significant when reflecting upon undue influence as it is when reflecting upon testamentary capacity. *Id.* More credence may be given to remote mental history. *Id.*

Here, Dr. Wignarajan testified that, as far back as 2005, Decedent had complained of memory loss. Family members testified to the fact that Decedent had difficulty recognizing them as early as 2006. By 2008, it was Dr. Wignarajan's opinion that Decedent was suffering from "late stage dementia." Wignarajan Deposition, 10/19/11, at 20. "If the [Orphans' Court's] decision rests upon legally competent and sufficient evidence, we will not revisit its conclusions." *Fritts, supra.* Based upon the foregoing, we conclude that the court did not abuse its discretion when it concluded that Decedent was suffering from a weakened intellect in the months and years leading up to the execution of the 2008 will. *Clark, supra.*

Finally, a confidential relationship exists "when the circumstances make it certain that the parties did not deal on equal terms, but on the one side there is an overmastering influence, or, on the other, weakness, dependence or trust, justifiably reposed." *Clark*, 334 A.2d at 633, quoting *Leedom v. Palmer*, 274 Pa. 22, 117 A. 410 (1922). "A confidential relationship is created between two persons when it is established that one occupies a superior position over the other—intellectually, physically, governmentally, or morally—with the opportunity to use that superiority to the other's disadvantage." *In re Estate of Thomas*, 463 Pa. 284, 344 A.2d 834, 836 (1975). "[S]uch a relationship is not confined to a particular association of parties, but exists whenever one occupies toward another such a position of advisor or counselor as reasonably to inspire confidence that he will act in good faith for the other's interest." *Estate of Keiper*, 308 Pa.Super. 82, 454 A.2d 31, 33 (1982), quoting *Silver v. Silver*, 421 Pa. 533, 219 A.2d 659, 662 (1966). A spousal relationship does not automatically translate into a confidential relationship for purposes of determining the presence of undue influence. *See Stewart v. Hooks*, 372 Pa. 542, 94 A.2d 756, 760 (1953). "[I]n any given case it is a question of fact whether the marital relationship is such as to give [one spouse] dominance over [the other] or to put [that

9. *See* Khalil Deposition, 3/23/11, at Exhibit 1 (William Smaling Client Information Sheet).

spouse] in a position where words of persuasion have undue weight." *Id.*

Here, Dr. Wignarajan testified that Norine began accompanying Decedent to his appointments in approximately 2005, when he was diagnosed with prostate cancer. Doctor Wignarajan stated that Norine "dominated the conversation usually and she said what she wanted." Wignarajan Deposition, at 13. Norine also made all of Decedent's appointments and demanded from Dr. Wignarajan what she wanted, such as referrals.

Similarly, Attorney Khalil testified that Norine, not the Decedent, contacted her to set up the appointment to draft the 2008 will. Attorney Khalil also testified that the client information sheets she gave to Norine and the Decedent to complete were returned to her completed in the same handwriting. She stated that Norine communicated the Decedent's estate-planning goals to her, which she felt was "not appropriate." Khalil Deposition, 3/23/11, at 31. Accordingly, Attorney Khalil asked Norine to step out of the room so that she could meet privately with Decedent. However, Norine did not want to leave, stating "I'm his wife" and asking Decedent if she could stay. However, Attorney Khalil insisted that she leave and she ultimately did so. Attorney Khalil also testified that Norine spoke to her about the poor relationship Decedent had with his children, what a "great wife" she had been to the Decedent, and how she had been taking "excellent care" of Decedent for many years. *Id.*, at 31–32. According to Attorney Khalil, Norine did "almost all of the talking" during the appointment. *Id.*, at 32.

William testified that, during a 2008 visit by Decedent and Norine to the U.S., William attempted to contact his father via telephone approximately eight times over a two week period. He left messages at their hotel and on Norine's cell phone, but never received a call back. William stated that he would only be made aware of an impending visit by the Decedent via email messages from Norine shortly before their arrival. He also testified that, whenever he would communicate with his father via Skype, Norine always appeared onscreen next to him.

Based on the foregoing, we cannot say that the Orphans' Court abused its discretion in concluding that Norine enjoyed a confidential relationship with the Decedent.[10] She took the reins with respect to almost all aspects of Decedent's life, whether it be his health care, his estate planning or his ability to communicate with his children. Given Decedent's weakened mental state, the record supports the court's finding that Norine and Decedent "did not deal on equal terms, but on the one side there is an overmastering influence, or, on the other, weakness, dependence or trust, justifiably reposed." *See Clark, supra.*

Finally, Norine claims that the Orphans' Court "abused its discretion and committed an error of law by failing to give due consideration to the testimony as a whole and the interest of the witnesses[.]" Brief of Appellant, at 4. This is a weight of the evidence claim, which, for the reasons discussed *supra,* we will review in the first instance due to the impossibility of review by the now-retired trial judge. *Armbruster, supra.*

10. Norine correctly notes that the Orphans' Court mistakenly believed that the 2008 will was executed "just days after [Decedent's] prostate surgery," and cited that fact in support of its finding that a confidential relationship existed. However, upon review of the record as a whole, we conclude that this error was harmless, as there was sufficient other evidence to support the court's conclusions.

Norine argues that the Orphans' Court placed too much weight on the testimony of witnesses she describes as "interested witnesses" and accorded insufficient weight to her own testimony, as well as that of William Fort, a witness to the 2008 will's execution. Norine also asserts that the court "gave great consideration to [the testimony of the scrivener,] Attorney Maggi Khalil, but only to the extent it supported the court's views." Brief of Appellant, at 15.

Norine argues that Decedent's sons and brother-in-law [11] are "interested witnesses" whose testimony should therefore be discounted. However, in making this assertion, Norine overlooks the fact that she, too, is an "interested witness" in this matter. Accordingly, her testimony is entitled to no more deference than that of William and Wayne. Moreover, contrary to Norine's assertion, Decedent's brother-in-law, Frank Papson, has no pecuniary interest in the outcome of this matter, having been named in neither the 2005 nor 2008 will.

Norine also asserts that the Orphans' Court should have given "some consideration" to the testimony of William Fort, who witnessed the 2008 will and briefly interacted with the Decedent prior to the execution of the will. Norine argues that Fort was a disinterested witness who concluded that Decedent "was acting voluntarily and knew what he was doing and that [Norine] was pleasant and polite at the 2008 Will signing." Brief of Appellant, at 15.

Fort's deposition testimony was submitted into evidence on Norine's behalf. Fort testified that he worked in the office next to Maggi Khalil, Esquire, the scrivener of Decedent's will, and that Attorney Khalil asked him to witness the will's execution. As he understood Attorney Khalil's re-

quest, his duty as a witness was to "make sure [Decedent] knows what he's doing . . . make your own decision when you talk to him." Fort Deposition, 3/31/11, at 8. Fort stated that he exchanged pleasantries with both the Decedent and Norine and that the Decedent was coherent and not confused in any way. However, Fort also testified that Decedent "didn't say anything. Only thing that I heard him say to me when he said hello and I asked him, how are you. He said I'm fine. That's the only time I heard his voice when he spoke to me." *Id.*, at 16. Fort estimated that his interaction with Decedent lasted approximately ten to fifteen minutes.

The Orphans' Court did not cite Fort's testimony in its opinion. Our review of the deposition transcript reveals that Fort's testimony provided little, if anything, of significance that would have assisted the court in its findings, much less been of help to Norine in proving Decedent's soundness of mind. According to Fort, the only words the Decedent spoke to him were "I'm fine" in response to Fort's inquiry as to how he was doing. Although Fort testified that Decedent was "coherent," he gave virtually no insight into the manner in which he arrived at that conclusion, other than that Decedent was able to respond when asked how he was doing. Moreover, Fort's testimony was contradictory as to whether Decedent told him he was aware he was signing his will. On direct examination by Norine's counsel, the following exchange occurred:

Q: Did you hear [Decedent] talk about what he was doing in your presence?

A: As far as what?

Q: Did he say to you this is my will and I'm going to sign it or words to that effect?

---

11. In her brief, Norine refers to Frank Papson as Decedent's brother. *See* Brief of Appellant, at 15. Mr. Papson was, in fact, Decedent's brother-in-law and we refer to him as such.

A: I don't remember that. No.

*Id.,* at 13. Later, during Fort's examination by William's counsel, the following exchange occurred:

Q: And did he specifically say anything about what he was signing that day that led you to believe that he knew it was a will?

A: Yeah. He acknowledged that it was.

Q: And what did he say?

A: That that was his will.

Q: He said to you this is my will that I'm signing?

A: To that nature, yeah, he acknowledged that what he was signing, because I acknowledged to him I'm witnessing your will.

Q: Okay. And then did he respond verbally or did he nod his head or?

A: No. He verbally acknowledged and said yes.

*Id.* at 22. This latter exchange also contradicts Fort's earlier assertion that "the only time [Fort] heard [Decedent's] voice" was when he told Fort "I'm fine." In short, we fail to discern how Fort's testimony was beneficial to Norine's case. Therefore, to the extent the Orphans' Court may have discounted it in rendering its decision, we can find no abuse of discretion. In any event, we concluded above that the court abused its discretion in determining that Decedent lacked testamentary capacity—the sole issue to which Fort's testimony was relevant.

■ Norine also claims that the Orphans' Court essentially cherry-picked from Attorney Khalil's testimony those statements which supported its own views. As noted above in our discussion of Norine's testamentary capacity claim, we agree that the Court abused its discretion by failing to consider those portions of Attorney Khalil's testimony which clearly supported a finding that Decedent possessed testamentary capacity on the day he executed his will. However, to the extent the court considered Attorney Khalil's testimony in rendering its decision on undue influence, we can ascertain no legal error or abuse of discretion.

The Orphans' Court summarized Attorney Khalil's deposition testimony as follows:

[Khalil], the drafter of the 2008 Will, was deposed in this matter on March 23, 2011. Khalil described Decedent as elderly and slow moving. She recalled that his hearing was poor and that he was always tired and sleepy. Khalil testified that Norine was actually the one who had contacted her to draft the will and that she wanted it done right away. She stated that Norine had attempted to hire other local attorneys before her to no avail probably because she appeared to be a demanding client. Khalil agreed that the handwriting on both client intake information sheets was the same and admitted she was not experienced in estate matters and "not an expert." She noticed that during her meeting with the Decedent in preparation of the 2008 Will, he had been falling asleep during portions of their conversations. This concerned Khalil to the degree that she thought, "perhaps this isn't the best time for him [to be] doing this because he was so tired." She recalled asking him to come back another day when he wasn't so tired. Khalil testified that she did not inquire about Decedent's children as beneficiaries because Norine had explained that he was not in contact with them. She noted that Decedent did not correct Norine but was not sure whether he responded assertively in any way. Khalil testified that the only time Decedent seemed uncomfortable was regarding appointing his stepson, Norine's son, as alternate executor of the Will.

She recalled that after Norine spoke with him in Dutch, he became comfortable with it, which reassured Khalil. Finally, Khalil recalled that Norine was present in the room at the time of the Will's execution.

Khalil also testified about her meeting with Norine. Khalil described Norine as aggressive and in a rush. She testified that Norine did most of the talking and was the one to discuss Decedent's estate "goals," the details of what a great wife she had been and Decedent's poor relationship with his children. Khalil recalled that Norine was somewhat resistant when she asked her to leave the room so she could speak with [D]ecedent privately but that she cooperated after some explanation as to why that was appropriate. Sometime after preparing the 2008 Will, Norine contacted Khalil and mentioned that "maybe his children had kidnapped him." This was the last time Attorney Khalil heard from Decedent or Norine.

Trial Court Opinion, 11/18/11, at 7–8.

Our review of the transcript of Attorney Khalil's deposition demonstrates that these findings are supported by the record. As such, the Orphans' Court was justified in relying upon them in drawing its legal conclusions regarding the issue of undue influence. This claim, therefore, is meritless.

In conclusion, we hold that Norine preserved her weight of the evidence claims by raising them in a timely filed Rule 1925(b) statement. Upon review of those claims, we conclude that the Orphans' Court abused its discretion by finding that Decedent lacked testamentary capacity on the date he executed his 2008 will. However, we find no abuse of discretion in the Orphans' Court's ruling that Decedent's 2008 will was the product of undue influence exercised upon him by Norine. Ac-

cordingly, we affirm the decree of the Orphans' Court directing that the will dated April 11, 2005 be probated as the Last Will and Testament of William O. Smaling, a/k/a William Smaling.

Decree affirmed.

BOWES, J., files a Concurring and Dissenting Opinion.

CONCURRING AND DISSENTING OPINION BY BOWES, J.:

I join the portions of the majority's decision that find Appellant's issues are not waived and that affirm the conclusion that the will in question was procured by undue influence. However, I respectfully dissent to the extent that the majority reverses the determination of the orphans' court that the testator lacked testamentary capacity on October 29, 2008.

William O. Smaling died on December 31, 2009, and, on January 22, 2010, the Register of Wills of Monroe County (the "Register") admitted to probate a will dated April 11, 2005, and the Register granted letters testamentary to decedent's son, William C. Smaling ("William"). Under the 2005 will, Appellant, who is the decedent's wife, Norine C. Smaling, was bequeathed $35,000 and the residue of the estate was divided equally between decedent's two sons, William and his brother Wayne Smaling.

On March 3, 2010, Appellant filed a petition to probate a will dated October 29, 2008. In that document, Appellant received the entire estate. On April 9, 2010, the Register certified the record to the orphans' court division, and the orphans' court issued a rule to show cause why the 2008 will should not be admitted to probate. The decedent's two sons averred that the October 29, 2008 will was invalid as it was signed when their father lacked

testamentary capacity and it was obtained by undue influence exercised by Appellant.

On October 27, 2011, the orphans' court held a hearing and entertained evidence regarding the matter. Mr. Smaling was married to William and Wayne's mother for thirty years. Prior to their marriage, Mr. Smaling and Appellant executed a prenuptial agreement wherein they waived their rights in each other's pre-marital property. In 1999, Appellant and Mr. Smaling moved to the Netherlands. Thereafter, they visited the United States twice a year, and Mr. Smaling saw his family often from 1999 to 2009. Additionally, after his father began to live in the Netherlands, William regularly contacted him by telephone, e-mail, and Skype. In 2009, Mr. Smaling separated from Appellant. He returned to the United States and began to reside with William while Appellant continued to live in the Netherlands.

At the hearing before the orphans' court, both William and Frank Papson, Mr. Smaling's brother-in-law, testified that by 2006, Mr. Smaling began to suffer from memory lapses. In 2008, Mr. Smaling repeatedly failed to recognize that William was his son and had to be reminded of that fact. Mr. Papson testified that in 2007, Mr. Smaling was unable to converse coherently and that in 2008, Mr. Smaling did not recognize people whom he had known for many years. Wayne reported that his father did not know who Wayne was when they encountered each other at an April 2008 funeral.

Admitted into evidence was the deposition of Dr. Kanagarayer R. Wignarajan. Dr. Wignarajan was the internist who treated decedent for many years and saw him just days before he signed the October 29, 2008 will. Dr. Wignarajan stated that Mr. Smaling began to suffer memory loss in 2005 and by October 2008, he had late-stage dementia. Dr. Wignarajan opined that by October 29, 2008, decedent "could not have known the value of anything he had," and that he was not capable of even writing a check. Deposition of Kanagarayer R. Wignarajan, 10/19/11, at 26. Additionally, at that time, Mr. Smaling was "not oriented in place and time." *Id.* at 36.

Appellant presented the testimony of the scrivener of the will, attorney Maggi S. Khalil, by deposition. Ms. Khalil admitted that, when she met with Mr. Smaling to prepare his will, she had no experience in probate and estate matters. Deposition of Maggi S. Khalil, 3/23/11, at 13. She reported that Appellant called her on October 29, 2008, and demanded that Mr. Smaling's will be prepared and executed that same day. When Appellant and Mr. Smaling arrived at Ms. Khalil's office, Ms. Khalil left Appellant and Mr. Smaling alone in a conference room, where Appellant completed a brief questionnaire that reported information about where she and Mr. Smaling were born and resided.

After the questionnaire was prepared, Ms. Khalil met with Appellant and Mr. Smaling together. Mr. Smaling was tired when they were discussing the contents of his proposed will, and he fell asleep at various points during their meeting. *Id.* at 40. Appellant dominated the conversation, informed Ms. Khalil that the decedent was estranged from his sons and never had any contact with them, and said that the will was to leave everything to her and, in the event of her death, to her son.

Thereafter, Ms. Khalil had a "very short meeting" alone with the decedent. *Id.* at 34. During that time, she confirmed that he wanted to leave everything to Appellant. *Id.* Ms. Khalil did ascertain that the decedent was aware that he had two sons, but she admittedly failed to confirm with Mr. Smaling himself that he was completely estranged from them. *Id.* at 36. Ms.

Khalil merely concluded that Appellant was correctly reporting that Mr. Smaling had "no contact" with William and Wayne based upon Mr. Smaling's body language when Appellant was reporting that information to Ms. Khalil. *Id.*

Ms. Khalil repeatedly stated during her deposition that she did not remember if she had a conversation with Mr. Smaling about what he owned. Specifically, Ms. Khalil was asked, "Did you speak to [Mr. Smaling] about what he owned and what he was going to be disposing of through this will?" *Id.* at 38. She responded, "Details of that conversation, I don't recall." *Id.* This subject was re-visited later in the deposition when Ms. Khalil was asked, "Did you get a sense of whether [Mr. Smaling] was aware of what his estate was comprised of while you were alone without [Appellant] being in the room?" *Id.* at 65–66. She answered, "Unfortunately, I don't recall." *Id.* at 66. The inquiry was repeated, "So you didn't go over real estate or bank statements, or nothing like that was discussed without Mrs. Smaling in the room?" *Id.* Ms. Khalil confirmed, "I don't recall." Ms. Khalil was unable to confirm that she knew the composition of the estate or how she was told about it. *Id.* at 41 ("Because it was my understanding it was a somewhat large estate, but I didn't—either I don't remember the details of that large estate, or we didn't delve into it.").

Based upon all this proof, the orphans' court concluded that William, Wayne and Mr. Papson were credible, and that their testimony established that, by 2008, Mr. Smaling was incapable of recognizing his sons and other family and friends. Based on these credibility determinations, it accepted Dr. Wignarajan's assessment. Trial Court Opinion, 11/18/11, at 10. As noted, Dr. Wignarajan's deposition detailed that Mr. Smaling's mental state prevented him from being aware of what he owned. The orphan's court concluded that Mr. Smaling lacked testamentary capacity on October 29, 2008.

The majority reverses that determination and concludes that the only probative evidence on this issue was the testimony of the scrivener of the will. Majority Opinion, at 494. It focuses upon the answer to a leading question that Ms. Khalil answered at page forty-five of her deposition. At that time, Ms. Khalil was asked by Appellant's counsel, "In your professional opinion did you have any doubts in your mind that Mr. Smaling knew what he owned and what he was doing in making a will?" Deposition Maggi S. Khalil, 3/23/11, at 45. Ms. Khalil answered that she did not doubt that Mr. Smaling possessed testamentary capacity on October 29, 2008.

First, I believe that the majority's decision contravenes the standard of review applicable to orphans' court matters. Moreover, the majority has viewed page forty-five of the deposition out of context. When read as a whole, the deposition failed to establish that Mr. Smaling had testamentary capacity when he executed the October 29, 2008 will.

I repeat the well-established standard of review that we employ in the present context:

"Our standard of review of an orphans' court's decision is deferential." *In re Estate of Strahsmeier*, 54 A.3d 359, 362 (Pa.Super.2012). When reviewing an orphans' court decree, this Court must determine whether the record is free from legal error and whether the orphans' court's findings are supported by the record. *Id.* at 362–363. Because the orphans' court sits as the finder of fact, it determines the credibility of the witnesses and, on review, this Court will not reverse its credibility determinations absent an abuse of discretion. *Id.* at

363. However, this Court is not bound to give the same deference to the orphans' court conclusions of law. *Id.* Where the rules of law on which the orphans' court relied are palpably wrong or clearly inapplicable, we will reverse the court's decree. *Id.* Moreover, we point out that an abuse of discretion is not merely an error of judgment. However, if in reaching a conclusion, the court overrides or misapplies the law, or the judgment exercised is shown by the record to be manifestly unreasonable or the product of partiality, prejudice, bias, or ill will, discretion has been abused. *Id.*

*In re Estate of Zeevering,* 2013 WL 5366989, 1–2 (Pa.Super.2013).

Herein, the orphans' court credited Dr. Wignarajan's assessment of the decedent's mental acuity in October 2008 based on its credibility determinations regarding the testimony of other witnesses who established that mental state. There was ample evidence to support the orphans' court's decision that Mr. Smaling lacked testamentary capacity. He had late-stage dementia by the end of 2008, he did not know family and friends unless prompted, and, according to his internist, he was unable to comprehend the nature of his assets. The majority improperly relies upon a deposition that was rejected by the orphans' court. Given other evidence of record and various admissions made by Ms. Khalil during that deposition, I believe that it is an improper exercise of appellate jurisdiction to reverse the orphans' court's finding regarding testamentary capacity.

Additionally, an examination of the complete deposition of Ms. Khalil establishes that it failed to indicate that Mr. Smaling possessed testamentary capacity on October 29, 2008. "Testamentary capacity exists when the testator has intelligent knowledge of the natural objects of his bounty, the general composition of his estate, and what he wants done with it, even if his memory is impaired by age or disease, and the testator need not have the ability to conduct business affairs." *In re Bosley,* 26 A.3d 1104, 1111–12 (Pa.Super.2011).

First, Ms. Khalil admitted that Appellant gave her all of the information about the alleged family dynamic among Mr. Smaling and his sons. While the deposition indicates that Mr. Smaling was aware he had two sons, Ms. Khalil never ascertained from Mr. Smaling, outside of Appellant's presence, that he had absolutely no contact with his sons by 2008. The record establishes that Appellant's statements to Ms. Khalil were false and that Mr. Smaling was in constant contact with William from 1999 until Mr. Smaling's 2009 death. Mr. Smaling never corrected his wife's false representations to the attorney. Thus, Ms. Khalil's deposition did not prove that Mr. Smaling had an intelligent knowledge of the natural objects of his bounty.

Additionally, Ms. Khalil admitted on four occasions that she did not remember having any conversation with Mr. Smaling about the composition of his estate. Thus, her deposition failed to prove that he had an intelligent understanding in that regard. The majority has taken the answer to the leading question asked on page forty-five of the deposition out of context and has ignored Ms. Khalil's myriad admissions that she could not recall asking Mr. Smaling anything about his assets. Ms. Khalil's deposition does indicate that she went to great lengths to determine that Mr. Smaling knew he had sons and wanted to leave his assets to Appellant and her son. However, Appellant, as the majority acknowledges, was exercising undue influence over Mr. Smaling at the time. Further, this proof solely related to the final

element of the three-part test at issue herein.

In my view, it was entirely within the prerogative of the orphans' court to reject Ms. Khalil's statement that she was sure that Mr. Smaling had testamentary capacity when he executed his will. Hence, I respectfully dissent from the majority's ruling that Mr. Smaling had testamentary capacity on October 29, 2008.