J. A21040/14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| ESTATE OF ROBERT E. CLAYTON, DECEASED | : IN THE SUPERIOR COURT OF : PENNSYLVANIA : |
| APPEAL OF: MARK ANDREW CLAYTON, INDIVIDUALLY AND AS GUARDIAN OF ZOE ROSE CLAYTON | : : : : |
| | : No. 36 EDA 2014 |

Appeal from the Order Entered November 26, 2013,
in the Court of Common Pleas of Montgomery County,
Orphans' Court at No(s): 2011-X3719

BEFORE: BOWES, OTT, and STRASSBURGER*, JJ.

MEMORANDUM BY STRASSBURGER, J.:          **FILED AUGUST 27, 2014**

Mark Andrew Clayton (Mark), individually and as guardian of Zoe Rose Clayton (Zoe),[1] appeals from the order entered on November 26, 2013, which dismissed his objections to the accounting for the Estate of Robert E. Clayton (the Estate), and confirmed the account. Upon review, we affirm.

Robert E. Clayton (the Decedent) was the husband of Rose Clayton (Rose) and the natural parent of two adult children, Mark and Victoria Clayton (Victoria). The Decedent died on July 22, 2011, and pursuant to his will, Rose was appointed as executrix. The will provided that Zoe, Victoria, and Mark would each receive a $50,000 bequest, and Rose would receive all tangible personal property and the entire residuary estate.[2] On August 13,

---

[1] Zoe is Mark's daughter.

[2] Because Zoe was a minor, her share was to be held in trust until she reached the age of 30, and Victoria was appointed trustee.

* Retired Senior Judge assigned to the Superior Court.

2012, Rose submitted a notice of inheritance tax appraisement, and listed cash assets of the Estate as $42,179.36. Mark filed an objection to this inheritance tax appraisement, and requested that Rose file a petition for adjudication of her proposed distribution pursuant to Pa.O.C. Rule 6.9.

On December 28, 2013, Rose filed the petition. The petition set forth the aforementioned cash balance of $42,179.36, and subtracted disbursements for funeral expenses, debts of the Decedent, fees, and attorneys' fees totaling $33,821.08. Thus, the remaining balance was $8,355.28. Accordingly, Rose's petition proposed that the Estate hold the entire principal balance until all issues are resolved in order to pay attorneys' fees, and then distribute the residuary in equal thirds to Victoria, Mark, and Zoe.

On February 4, 2013, Mark filed objections to this proposed distribution on behalf of both himself, and his daughter, Zoe. Specifically, he averred that the account "fails to report stock and mutual funds which the [D]ecedent had owned which [he] believe[s] that the value exceeded the sum of $1,350,000.00" Objections, 2/4/2013, at ¶ 4. Moreover, Mark alleged that Victoria, who was the Decedent's power of attorney, "used the Power of Attorney to take control of [D]ecedent's financial affairs and used the [D]ecedent's assets for her own personal use and/or transferred the [D]ecedent's assets into her own name." *Id*. at ¶ 7. Mark also asserted that

the attorneys' fees of $5,260.00 were "unreasonable for the amount of time and effort needed to handle this estate." *Id*. at ¶ 13.

On August 26, 2013, the orphans' court held a hearing on Mark's objections. Mark's attorney presented to Rose a summary for a PNC Bank account in the Decedent's name. That summary, with copies of the cancelled checks, revealed that Victoria had written checks to herself from that account totaling $102,325 between August 13, 2010 and July 15, 2011. There were also three other checks written by Victoria to other payees in 2009 and 2010. Rose testified that she was "unfamiliar" with this account. N.T., 8/26/2013, at 12. However, she did testify that one check from that account, written for $2,549.80, was for an architect to design an addition to Victoria's house so Rose and the Decedent could move in with Victoria.

Rose also testified that Victoria persuaded her and the Decedent to purchase long-term care insurance. When it came time for the Decedent to utilize this insurance, Victoria did all of the paper work. Rose testified that Victoria "would transfer funds from her account into [the Decedent's] account." *Id*. at 33. Rose testified that Victoria "would take the money from her account and put it into [the Decedent's] account, and then she would pay the long-term healthcare." *Id*. at 33-34. Rose testified that the Decedent lived in a long-term care facility for the two-and-a-half years preceding his death, and Victoria handled all of the bills related to that care.

Victoria also testified at the hearing. She testified that she "had to borrow [$35,000] from [her] Vanguard account initially to pay for [her] father's bills because the money from [his IRA, the "Delaware" account,] had not been transferred in." *Id*. at 67. She testified specifically that the Decedent wished to use the money from the Delaware account to pay for his nursing home care. She testified repeatedly that she never borrowed money from the Decedent and every check written to her was for reimbursement of money she advanced the Decedent for his care.

Mark also testified. He testified that although he lived in Boston, he drove to see the Decedent in the hospital or nursing home frequently; that he loved his father very much; and, they had a wonderful relationship. He further testified that the Decedent expressed concerns about how Victoria was handling the money and indicated that Victoria was experiencing financial difficulties.

Rose testified in rebuttal to Mark's testimony. She testified that the Decedent was "cross with Mark because he walked in one day and said, I would like the deed to your house so I can sell it and put your (sic) mother in a nursing home. And my husband was so enraged that he said, you can get the hell out of here and never come back." *Id*. at 107. Rose testified that Victoria and Mark "hate" each other. *Id*. at 109.

Victoria also testified in rebuttal to Mark's testimony. She asserted that she has never experienced financial difficulties. *Id*. at 113. Victoria

further testified that the deed incident took place 18 months' prior to her father's death, and Mark never visited the Decedent after that time. ***Id***. at 114.

With respect to the issue of attorneys' fees, Attorney Samuel Trueblood (Trueblood) testified. He testified that his normal billing rate was $350 per hour. However, because he received this case through a referral from another attorney, he and Rose agreed to a rate of $300 per hour. Trueblood employs his wife, Mary Ellen, as his paralegal, and her time is billed at $175 per hour. He also testified about the hours he spent on this estate.

On November 26, 2013, the orphans' court issued an order dismissing Mark's objections and confirming the accounting. The orphans' court also concluded that total counsel fees would be capped at $10,000. Mark timely filed a notice of appeal. The orphans' court ordered Mark to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925. Mark timely complied; however, the orphans' court did not issue an opinion pursuant to Pa.R.A.P. 1925(a).

On appeal, Mark contends that the orphans' court erred "by ignoring the evidence that [Victoria] was not advancing funds to the [D]ecedent's bank account at PNC Bank because the [D]ecedent had insufficient funds to

pay his bills." Mark's Brief at 14.[3]  In support of his position, Mark directs us to Victoria's testimony that she deposited $5,000 into the Decedent's account at PNC Bank, and on the same day wrote a check to herself from that account for $5,500.  Mark asserts that the orphans' court ignored this piece of evidence; thus, its findings are against the weight of the evidence. Moreover, Mark points out that the only evidence offered by Rose and Victoria was their own "self-[serving]" testimony. *Id*. at 15.

We set forth our well-settled standard of review.

> Appellate review of weight of the evidence claims is limited. It is well-settled that:
>
> > [a]ppellate review of a weight claim is a review of the [trial court's] exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the

---

[3] We observe that in his Statement of Questions Involved, Mark presents six separate questions. Mark's Brief at 4.  However, the Argument section of his brief (*see id*. at 11-16) combines the first five of these questions into two argument sections, entitled "Standard of Care" and "Weight of the Evidence." *Id*. at 11, 12.  This structure is in violation of Pa.R.A.P. 2119(a) ("The argument shall be divided into as many parts as there are questions to be argued; and shall have at the head of each part--in distinctive type or in type distinctively displayed--the particular point treated therein, followed by such discussion and citation of authorities as are deemed pertinent."). Accordingly, rather than addressing the questions as presented in the Statement of Questions Involved, we address only those issues properly briefed in the Argument section.

> lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

*In re Estate of Smaling*, 80 A.3d 485, 490-91 (Pa. Super. 2013) (*en banc*) (quoting *Commonwealth v. Clay*, 64 A.3d 1049, 1055 (Pa. 2013) (internal citations omitted).[4]

Instantly, the orphans' court offered the following assessment of the testimony.

> Upon consideration of the evidence presented, we find that [Mark] failed to meet his burden of proof by clear and convincing evidence that improper pre-death transfers took place. He offered mere suppositions and suspicions about [Victoria's] conduct and exhibited naiveté about the enormous costs incurred when one spends several years in a nursing facility.

Trial Court Order, 11/26/2013, at 5.

We see no abuse of discretion with respect to this conclusion, particularly in this case where the orphans' court was the fact-finder. The orphans' court clearly credited Victoria's explanations for the transfers into and out of the Decedent's account. "[W]e defer to the factual findings and credibility determinations made by the orphans' court, so long as they are supported by the record." *In re Estate of Fuller*, 87 A.3d 330, 334 (Pa. Super. 2014). Thus, Mark's argument that the findings are against the weight of the evidence must fail.

---

[4] In this case, for reasons unknown to this Court, the orphans' court did not offer an opinion in response to Mark's timely-filed 1925(b) statement. However, we rely on the orphans' court's credibility determinations presented in its six-page November 26, 2013 order.

We now turn to Mark's final argument, where he contends that Trueblood's legal fees are excessive. Mark's Brief at 16-17. Mark offers the bald assertion that that Trueblood "billed twice as much time as should reasonably [be] allowed … considering the small amounts of assets and small number of creditors." *Id*. at 17.

Here, the orphans' court concluded that Mark "failed to rebut [Trueblood's] proof that the charges were reasonable and necessary." Orphans' Court Order, 11/26/2013, at 5. "Keeping in mind the complexity of the issues, the size of the gross estate (slightly more than $40,000) and the efforts expended in litigation, we find it necessary to cap the total counsel fees at $10,000." *Id*.

"In determining the reasonableness of counsel fee in an estate an appellate court will not disturb the decision of the Orphans' Court in the absence of an abuse of discretion or error of law." *Dorsett v. Hughes*, 509 A.2d 369, 371 (Pa. Super. 1986).

With respect to reasonableness of counsel fee in an estate:

> The facts and factors to be taken into consideration in determining the fee or compensation payable to an attorney include: the amount of work performed; the character of the services rendered; the difficulty of the problems involved; the importance of the litigation; the amount of money or value of the property in question; the degree of responsibility incurred; whether the fund involved was "created" by the attorney; the professional skill and standing of the attorney in his profession; the results he was able to obtain; the ability of the client to pay a reasonable fee for the services rendered; and, very

> importantly, the amount of money or the value of the property in question.

***Dorsett***, ***supra*** (quoting ***Trust Estate of LaRocca***, 246 A.2d 337, 339 (Pa. Super. 1986)).

Instantly, Trueblood reduced his regular fee to accommodate this estate. Moreover, the orphans' court clearly took into account the proper considerations, including the size of the estate and the litigation involved, in determining that a cap of $10,000 was reasonable. Mark offers no case law or specific argument to rebut this conclusion; thus we find no abuse of discretion or error of law in the orphans' court's determination.

Having concluded that neither issue raised by Mark on appeal entitles him to relief, we affirm the order of the orphans' court.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/27/2014