J-A08005-19

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| IN RE: MARIE E. DOUGLAS, AN ALLEGED INCAPACITATED PERSON | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: CHARLES R. DOUGLAS, JR. | : : : : | |
| | : | No. 1557 WDA 2017 |

Appeal from the Order Entered September 1, 2017
In the Court of Common Pleas of Jefferson County
Orphans' Court at No(s):  42-2017 O.C.

BEFORE:  PANELLA, P.J., STABILE, J., and McLAUGHLIN, J.

MEMORANDUM BY PANELLA, P.J.:                    FILED OCTOBER 22, 2019

Charles E. Douglas, Jr., ("Robbie") appeals from the order entered September 1, 2017, finding Marie E. Douglas, his mother, to be a totally incapacitated person and appointing her daughters, Karla Renee Douglas ("Renee') and Kerrie L. Tipton ("Kerrie"), to act as a plenary co-guardians of her person and estate.  Robbie contends that the record does not support the trial court's order removing Marie from his home and appointing guardians of her person and her estate.

Renee and Kerrie filed a petition alleging that Marie had been diagnosed with Alzheimer's disease and dementia, and that she was resultantly unable to care for herself or to manage her financial affairs. They further alleged that, subsequent to Marie becoming incapacitated, she had executed a Durable Power of Attorney in which she appointed her son, Robbie, as her primary

agent. Renee and Kerrie asserted that Robbie and his wife had exploited Marie's assets and were using her money to build an addition to his home.

The issues before us are limited to whether the appointment of the plenary guardian of the person and estate for Marie was supported by clear and convincing evidence and whether there was sufficient evidence to support Marie's removal from Robbie's home.[1] The trial court granted numerous forms of relief in its Opinion of September 1, 2017, including removing Marie from Robbie's home, appointing Renee and Kerrie to be co-guardians, and vacating Marie's most recently executed will, her power of attorney granted to Robbie, and deeds which the trial court found that Marie had executed after she had already become incapacitated.

Robbie initially raised numerous errors by the Orphans' Court and challenged most of the Court's decisions. However, as stated on the first page of his brief:

> Robbie has elected to drop the appeals of the orders invalidating Marie's will, the power of attorney under which Marie appointed him her agent, and the deeds out of Marie's revocable trust (numbers 1554, 1555, and 1556 WDA 2017).

Therefore, we will review (1) whether the evidence in support of the plenary guardianship was legally sufficient and (2) whether it was necessary for the Orphans' Court to order Marie's relocation to her daughter's home. See

_____

[1] Marie had been residing with Robbie since 2015.

Appellant's Brief, at 3. When reviewing a decree entered by the Orphans'
Court,

> this Court must determine whether the record is free from
> legal error and the court's factual findings are supported
> by the evidence. Because the Orphans' Court sits as the
> fact-finder, it determines the credibility of the witnesses
> and, on review, we will not reverse its credibility
> determinations absent an abuse of that discretion.
> However, we are not constrained to give the same
> deference to any resulting legal conclusions. Where the
> rules of law on which the court relied are palpably wrong
> or clearly inapplicable, we will reverse the court's decree.

In re Estate of Rosser, 821 A.2d 615, 618 (Pa. Super. 2003) (internal
quotation marks and citations omitted); see also Estate of Haertsch, 649
A.2d 719, 720 (Pa. Super. 1994) (noting that appointment of a guardian is
within the sound discretion of the trial court).

We employ a deferential standard when reviewing an orphans' court
decree. In re Estate of Smaling, 80 A.3d 485 (Pa. Super. 2013). We must
ensure, however, that the court's decision is free from legal error. In re
Estate of Rosengarten, 871 A.2d 1249, 1253 (Pa. Super. 2005). Our
Supreme Court reiterated this principle in In re Peery, 727 A.2d 539, 540
(Pa. 1999) (quoting Lawner v. Engelbach, 249 A.2d 295 (Pa. 1969)),
wherein it stated that reviewing courts are "bound by the trial judge's findings
of fact unless those findings are not based on competent evidence.
Conclusions of law, however, are not binding on an appellate court whose duty
it is to determine whether there was a proper application of law to fact by the
lower court."

We are mindful of the purpose of the Probate, Estates and Fiduciary Code's ("PEF Code") provisions relating to incapacitated persons, 20 Pa.C.S. §§ 5501-5555. Section 5502 recognizes that "every individual has unique needs and differing abilities." The purpose of the PEF Code is to establish "a system which permits incapacitated persons to participate as fully as possible in all decisions which affect them … and which accomplishes these objectives through the use of the least restrictive alternative." 20 Pa.C.S. § 5502. An incapacitated person is

> an adult whose ability to receive and evaluate information effectively and communicate decisions in any way is impaired to such a significant extent that he is partially or totally unable to manage his financial resources or to meet essential requirements for his physical health and safety.

20 Pa.C.S. § 5501.

Instantly, Robbie argues that the record does not contain competent evidence sufficient to sustain the Orphans' Court's findings that Marie's condition requires a plenary guardian. It is well-established that "[t]he selection of a guardian for a person adjudicated incapacitated lies within the discretion of the trial court whose decision will not be reversed absent an abuse of discretion." Estate of Haertsch, 649 A.2d 719, 720 (Pa. Super. 1994).

The PEF Code provides the standards governing findings of incapacity:

> (a) Determination of incapacity – In all cases, the court shall consider and make specific findings of fact concerning:

(1) The nature of any condition or disability which impairs the individual to make and communicate decisions.

(2) The extent of the individual's capacity to make and communicate decisions.

(3) The need for guardianship services, if any, in light of such factors as the availability of family, friends and other supports to assist the individual in making decisions.…

(4) The type of guardian, limited or plenary, of the person or estate needed based on the nature of any condition or disability and the capacity to make and communicate decisions.…
….
(c) Plenary guardian of the person – The court may appoint a plenary guardian of the person only upon a finding that the person is totally incapacitated and in need of plenary guardianship services.

20 Pa.C.S. § 5512.1.(a) and (c). Accordingly, Renee and Kerrie had the burden of proving that Marie is totally incapacitated and in need of a guardian. Under the PEF Code,

[t]o establish incapacity, the petitioner must present testimony, in person or by deposition from individuals qualified by training and experience in evaluating individuals with incapacities of the type alleged by the petitioner, which establishes the nature and extent of the alleged incapacities and disabilities and the person's mental, emotional and physical condition, adaptive behavior and social skills. The petition must also present evidence regarding the services being utilized to meet essential requirements for the alleged incapacitated person's physical health and safety, to manage the person's financial resources or to develop or regain the person's abilities; evidence regarding the types of assistance required by the person and as to why no less restrictive alternatives would be appropriate; and evidence

regarding the probability that the extent of the person's incapacities may significantly lessen or change.

20 Pa.C.S. § 5518 (emphasis added).

Based upon the evidence presented by Renee and Kerrie, the Orphans' Court painstakingly reviewed the record and entered 74 detailed findings of fact:

1. Marie and her now deceased husband, Charles R. Douglas, Sr. ("Charles") established the "Douglas Living Trust" ("Trust") on March 3, 2005. Pet. Exh. N. They named themselves as trustees and Renee and Kerrie as their first choice of successor trustees should they both [become] unwilling or unable to serve, id., Art. 3, § 4, thereby effectuating their mutual desire that Renee serve as executor of their estate and reflecting Renee's election of Kerrie as her helper.

2. The Trust instrument further designated Robbie as Renee's replacement if she could not or would not serve; Tina M. (Douglas) Meyers ("Tina"), their middle child, as Kerrie's replacement; and Robbie and Tina together if both Renee and Kerrie were unwilling or unable to serve. Id. The second -oldest child, Angela K. (Douglas) Murphy ("Angie"), was not named as a potential successor trustee.

3. Charles and Marie devised a primary distribution scheme whereby each of their five children would receive 10% of the Trust property after [Charles's and Marie's] death, with the remaining 50% going to "each of our living grandchildren in equal shares." Id., Art. 11, §1.

4. The Trust property was itemized in "Schedule A" and included four properties located in Jefferson County, PA., id., Art. 2, § 5 & Sch. A, one utilized for Charles and Marie's concrete business and three they kept as residential rental properties. Also included were their two Maryland properties-their business and their home-as well as a notation of a debt owed by Robbie and his wife, Lisa Douglas ("Lisa"). Id.

5. In addition to whatever official records he may have kept, Charles maintained a meticulous accounting of personal and

business-related financial transactions in a spiral notebook. Among them was a detailed rendering of Robbie's indebtedness, which had a starting balance of $30,000.00 and an ending balance of $31,500.00. Pet. Exh. G. Beside the initial entry was the following comment: "SUBT ANY BAL OWED FROM PROCEEDS OF ESTATE." Id. Renee, though generally aware of Robbie's debt, saw that entry for the first time in 2014. Kerrie was aware of it, as well.

6. Wanting his oldest daughter to be aware of tax liabilities and other aspects of his and Marie's financial affairs, Charles showed Renee his spiral notebook in the Fall of 2014. She had long been the one he had relied on to make bank deposits and transfers for him and was now preparing her to assume greater responsibility if it became necessary.

7. Approximately five months after showing her the notebook, Charles asked Renee to take over the finances completely, and at first she went to her parents' house to handle the books. Fearful that Marie would misplace them, however, she eventually took them to her house, where she continued to make sure that her parents' financial concerns were in order.

8. When Charles learned in April that [Renee] had removed the books from his house, he became upset and demanded them back, telling her that she had overstepped the boundaries of her authority by removing them. When she explained her reasons, however, he conceded the wisdom of keeping them away from Marie and told his daughter to keep doing what she was doing. He later confirmed in Kerrie's presence that he wanted Renee to retain control of the books.

9. Not privy to the conversations between father and daughter, and without asking Renee what had transpired, Robbie and Tina, who was allowing herself to be influenced by Robbie and Lisa's unsubstantiated rumors and suggestions, arrived at the conclusion that their sister was trying to steal from their parents. They had no proof of malfeasance, but Robbie soon convinced Kerrie and Marie to also believe that Renee was a thief.

10. Until approached by Angie, who was likely perceived as non-adversarial on account of her neutrality, Renee resisted her siblings' efforts to gain access to and inspect their parents' financial records. Although she was in fact protecting Charles and

Marie's interests, therefore, she was doing little to dispel the doubts growing in her brother and sisters' minds.

11. As events transpired, Kerrie assumed control of the books late in April of 2015, and for the next year she was the one paying the bills, some as they arrived in her mailbox and others pursuant to Robbie's instructions. Early in 2016, however, she began to suspect that Robbie was exploiting their mother for financial gain, and seeming to have become aware of her misgivings, he convinced Marie that Kerrie could not be trusted with the finances any longer. Accordingly, all of Marie's monetary assets were under Robbie's control by the middle of the year.

12. In addition to the Trust, Charles and Marie each executed two powers of attorney, one for their property and the other for their healthcare. Marie named Charles as her agent, with Renee and Kerrie as her first choice of successor agents under her "Property Power of Attorney," Pet. Exh. I., and Renee and Tina as successor agents under her "Maryland Durable Power of Attorney for Health Care." Pet. Exh. J.

13. When Charles passed away on April 21, 2015, the Trust and original powers of attorney were still in place.

14. Throughout their marriage, Marie was dependent on Charles. He was the one managing the finances and making important decisions. Marie tended to accept his ideas as her own and always agreed with him. As Kerrie characterized it, she "stood by" her husband. In their later years together, as Marie's Alzheimer's progressed, Charles also became her caretaker; he was the one making all of his wife's decisions and organizing her life.

15. Charles was diagnosed with cancer approximately fifteen weeks before his body succumbed to it, and for most of that time, Renee practically lived at her parents' house and fulfilled the role of caretaker for both of them. Marie wanted to care for [Charles] but was physically and mentally unable, and Kerrie was the only other person offering any assistance.

16. Approximately a week before her father's death, Kerrie called Tina for help. Under the strain of her circumstances, she demanded that her younger sister "do her share" to care for their parents. Tina, in turn, called Robbie because she was unable to do

what Renee wanted. Robbie responded by asking if she wanted him to come down, and she said yes.

17. On a prior occasion, Renee had placed a call to Robbie's phone and left a voice mail asking him to call Marie and calm her down. Marie was angry and inconsolable, and Renee feared that she would hurt herself. She calmly explained that Marie's doctor would not be available until morning and that a civil commitment would be the result if she called the authorities. She clearly did not want that to happen and thus asked her brother to intervene.

18. When he and Lisa arrived in Maryland after Tina's call, Robbie began telling his other sisters not only that Renee was mishandling their parents' finances, but also that she could not care for them and wanted to have Marie institutionalized. His "proof' was her voicemail.

19. Tina advised Robbie not to speak ill of Renee in front of Marie. Because of her dementia, she cautioned him, their mother would assimilate his allegations as fact if he repeated them often enough.

20. While they were there, Robbie and Lisa continued to denigrate Renee to the rest of the family, including Marie, and effectively turned everyone but Angie against her. Meanwhile, he denied Renee access to their mother, telling her whenever she went over that Marie did not want to see her.

21. When Robbie and Lisa returned to Pennsylvania, Marie accompanied them for a month-long visit. Robbie arranged for Brenda Bussard ("Brenda") to stay with her while he and Lisa were at work during that month, purportedly "for companionship," though he also testified that he would not have been comfortable leaving her by herself for 9 hours each day.

22. Before they left, Robbie delivered an oral eviction notice to Marie's granddaughter, Kristen, and her boyfriend, who had been living with Marie and Charles for an unspecified period of time. When he and Marie returned to Maryland approximately thirty days later, he changed the locks and advised his mother that Kristen had stolen her TV, which was actually a unit Kristen had purchased for the household and decided to take with her. Thereafter, Marie began referring to both her and Renee as thieves.

23. With the consent of all but Renee, it was decided shortly after she and her son returned to Pennsylvania the second time that Marie would move in with Robbie and Lisa permanently. Tina, Kerrie, and Angie assisted with the move. Renee did not know it was happening until she saw the U-Haul truck outside of her mother's residence.

24. After Marie moved in, Brenda became her permanent caretaker. Robbie, Lisa, and another friend sometimes supplemented her services.

25. Marie initially stayed in the spare bedroom upstairs but found it difficult to navigate the steps on a regular basis, so Robbie partitioned the downstairs living room and built an additional bedroom for his mother.

26. The house was not large enough to accommodate all of Marie's belongings, which Robbie thus stored in [] a 12' by 56' office trailer that had been delivered to his property while he was in Maryland. The structure was visible from the house, and Marie went over frequently to sort through photographs and handle some of her possessions.

27. As the year came to a close, Robbie convinced Marie to execute a POA naming him as her agent and to realign the distribution of her estate. Lisa suggested Jendi Schwab, Esq. ("Schwab") as counsel for that purpose and called to schedule the initial appointment.

28. Schwab met with Marie, Robbie, and Lisa in December to discuss the POA, a new will, and changing the Trust. She referred them to separate counsel to address the Trust and related property issues but handled the will and POA herself.

29. Throughout their meeting, Robbie and Lisa did most of the talking. They advised Schwab that Marie wanted Robbie to be her agent and manage her property and personal affairs. Schwab testified that Marie's ability to respond at length was limited and could not recall what questions she may have asked or what specific responses the older woman may have given. She said she was certain that Marie understood what was happening and was in agreement with what Robbie and Lisa were saying, however.

30. When the Douglases returned on January 5, 2016, Schwab took Marie to the conference room by herself and explained the POA at length. It was her recollection that Marie appeared to be confused at times but was able to comprehend when she reiterated a perplexing provision in simpler terms. It was also her recollection that Marie was actually engaged in the process, though the only thing she could recall Marie clearly expressing was that she wanted Robbie to be her agent and to remove one of her daughters as a beneficiary.

31. Before leaving the office that day, Marie executed the POA entered into evidence as Respondent's Exhibit 1.

32. Marie and Robbie were again in Schwab's office on March 24, 2016 for Marie to sign the "Last Will and Testament of Marie E. Douglas." See Resp. Exh. 2. Though she had not previously reviewed the Trust and had no personal knowledge about what properties her client owned, Schwab was confident that the document expressed Marie's wishes, which had in fact been articulated to her by Robbie and Lisa.

33. From the first time they met until the last, Schwab was unaware that Marie had a longstanding Alzheimer's diagnoses, and despite her client's apparent linguistic limitations, the attorney saw no reason to question her mental capacity.

34. Between her meetings with Schwab, Marie signed a series of deeds prepared by David Grady, Esq. ("Grady") transferring the real property from the Trust into her name individually and then from her to her and Robbie as joint tenants with rights of survivorship. See Pet. Exhs. L-M. "For purposes of Pennsylvania Real Estate Transfer Tax," according to the initial deed, "this is a conveyance from a revocable trust . . . for purposes of revoking said revocable trust."

35. Whereas Lisa had initiated contact with Schwab, it was Robbie who called Grady and explained what Marie wanted to accomplish. Based on that conversation, Grady acquired copies of the relevant deeds from the courthouse and revised them according to Robbie's instructions.

36. Grady reviewed the deeds with Marie when she and Robbie were in his office on February 1, 2016 and was satisfied that Marie understood both the property transfers themselves and the legal

implications of revoking the Trust, though he did not recall whether they had actually discussed how the Trust's distribution scheme was being altered. Like Schwab, in fact, Grady could not recall his and Marie's conversations with any specificity.

37. Grady, too, was unaware that Marie was suffering from dementia the day she came into his office.

38. Even though she and Charles had discussed the Trust with their children, Marie did not tell any of her daughters that she had effectively dissolved the Trust, written a new will, and given Robbie complete control of her affairs under an all-encompassing POA that replaced the ones she and Charles had drafted. Robbie failed to mention it, as well.

39. Marie was diagnosed with Alzheimer's as early as 2008. Because of problems with her memory, she had retired from the work force two years before.

40. As reflected in her primary care physicians' office notes, Marie's cognitive abilities, including memory and concentration, were in a continual state of decline. See Pet. Exh. A. Whereas a Mini Mental Status Exam ("MMSE") score of 23/30 indicated mild cognitive impairment as of September 16, 2013, Marie was assessed as suffering from severe impairment just two years later. Id.

41. By the end of 2015, Marie was seeing Dr. Cyril Gamis because of her dementia, and he noted in his initial evaluation that she was living with her son and daughter-in-law and that the family was making efforts to obtain a guardianship. Id.

42. Marie's first visit with Dr. Lisa Witherite-Rieg as her primary care physician was in April of 2015, and even then it was Robbie and Lisa doing most of the talking on Marie's behalf. Marie primarily communicated with nods, smiles, and one-word answers confirming what her son and daughter-in-law were saying.

43. By the time she became Dr. Witherite-Rieg's patient, Marie required prompting to eat, bathe, take her medicine, and attend to comparable daily living activities. More complex tasks, such as managing her finances, were already beyond her cognitive abilities at that point.

44. For very different reasons, Robbie and Lisa also had trouble managing their own finances and found it necessary on several occasions to borrow money from various family members, including Charles and Marie.

45. It did not take Robbie long to figure out that he could use his mother as a supplemental source of income. Via check #1343, drafted on September 28, 2015, for instance, he took $500.00 as "reimbursement" for Marie's medications, Pet. Exh. E., even though she had only lived there for a few months point and the credible testimony and credit card statements indicated that her monthly out-of-pocket prescription would not have even come close to $500.00 that quickly.

46. Robbie also paid himself or Lisa the $72.00 per diem he would have otherwise paid Brenda when one of them stayed home to care for Marie, whether it was because Brenda was unavailable or because Robbie's union did not have a job for him that day.

47. On May 30, 2016, Robbie wrote himself a check from Marie's account in the amount of $11,200.00. Id. Angry that the Area Agency on the Aging had been to the house for the second time to investigate allegations that she and Robbie were neglecting Marie and exploiting her financially, Lisa decided that her mother-in-law would pay $800.00 per month in rent. Check #1380 covered the period from May 2015 through June 2016, and monthly checks in the amount of $800.00 followed thereafter. Id.

48. Conveniently, Marie's initial rent check was written just days before Lisa and her daughter, Lexi, were leaving for the girl's junior-year trip to Paris.

49. That $800.00 covered lodging, food, Marie's share of the salt consumption for the water system, some personal hygiene products, and gasoline for Robbie to transport her to doctors' appointments. She paid separately for her caretaker, most of the materials used to partition the living room, and her clothing, medications, and vitamins. She also paid the substantial expense of having electric run to the trailer that housed most of her belongings–a trailer Robbie had received free of charge from his employer–and a couple of exorbitant electric bills that followed.

50. Marie's rental payment equaled more than 75% of Robbie and Lisa's mortgage payment, and when Daniel Jablonski was also

paying $100.00 per week during the few months he occupied the spare bedroom in 2016, their rental income exceeded their mortgage payment.

51. Purportedly so that Marie could keep her belongings in the house rather than in the temperature -sensitive trailer, Robbie and Lisa eventually decided to build a 30′ x 30′ addition onto their home using Marie's money. They also used her funds to build a new back porch she supposedly said she wanted and had earlier used her money to install new windows in the entire house-again at her alleged bidding.

52. Marie also paid for Attorneys Schwab and Grady's services to secure the POA in Robbie's favor, draft her will, and effectively dissolve the Trust. She later issued an additional $800.00 "retainer" check to "Joe Ryan Law Office" after Robbie was notified of a third Area Agency on the Aging investigation.

53. Robbie and Lisa testified that Marie retained Attorney Ryan's services for herself. A former Agency employee, however, Lisa knew that she and her husband, not Marie, were the targets of the investigation.

54. After convincing Marie that "she" needed to hire counsel to represent "her" during the third Agency investigation, Robbie and Lisa also convinced the caseworker that Attorney Ryan was there for Marie.

55. Naive and grossly undertrained, the caseworker was also convinced after hearing Marie's single-word answers that she, a long-time Alzheimer's sufferer, affirmatively wanted to purchase the 6-seat Kawasaki ATV for which she paid $19,000.00. She further concluded that Robbie and Lisa were not financially exploiting Marie after accompanying Robbie to Farmer's National Bank to see statements from her checking account and accepting his averment that it was her only account.

56. Robbie and Lisa were financially exploiting Marie, though, and surely thought they could do so with impunity. They had seen how easy it was to manipulate her into believing that Renee and Kristen were stealing from her. They had also seen how quickly she acquiesced to living with them even though her remaining children and grandchildren resided in Maryland. And it did not take them long to figure out that she would not object to Robbie's

expenditures from her account or say no to his requests for loans or purchasing suggestions.

57. Their greed notwithstanding, Robbie and Lisa were attentive to Marie's physical needs. As Dr. Witherite-Rieg and other witnesses noted, she was always clean and appropriately groomed outside of the home, showed no signs of physical abuse, was well -nourished and compliant with her prescription regimen and medical appointments, and seemed to be content and comfortable with her son and daughter-in-law.

58. When Constable Pape went to remove Marie from her son's home on May 20, 2017, Robbie and Lisa were present and boldly announced that Marie was not going with him. Present for part of the confrontation, Marie became agitated, as well, and echoed their assertions.

59. When Sheriff Gotwald was there the following month, Robbie and Lisa were not home, and Marie easily agreed to go with him and live with her daughter. She changed her mind every time Brenda interjected but changed it back when the sheriff would reassert himself. When Gotwald finally silenced Brenda by telling her that he was taking Marie with him one way or the other, Marie cooperated without hesitation and allowed herself to be escorted into Renee's van without question.

60. Marie spent much of the ride to Maryland looking at photographs and quickly adapted to living at Renee's house.

61. When asked by her guardian ad litem, Marie expressed a desire to live with Robbie. The record does not reflect how the question was posed or which child she was living with at the time. Robbie, however, whose witnesses insisted that Marie wanted to live with him, indicated plainly that Marie vacillated on that issue. Asked whether it surprised him that his mother did not argue with Sheriff Gotwald on June 14, 2017, he answered, "Yes and no," explaining that his mother's stated living preference "depend[ed] on who [was] asking her."

62. Significantly, Marie did not talk about her daughters while she lived with Robbie or about Robbie and Lisa after going to Renee's.

63. Since returning to Maryland, Marie has been surrounded by family and has enjoyed attending various gatherings and spending

time with her daughters and grandchildren. She is happy in that environment, just as she was happy living with her son and daughter-in-law.

64. Renee, Kerrie, and Kristen shared caretaker responsibilities for the first five weeks of Maria's stay, with Kristen as the primary caregiver. After Kristen hurt her hand toward the end of July, Renee hired the Right at Home agency to assist three days a week, while Kristen continued to provide care the other two days until Marie could become comfortable with the agency staff.

65. Prior to her father's death and her mother's move to Pennsylvania, Renee did not receive compensation from either parent for the substantial amount of time and energy she invested attending to their physical needs and managing their finances.

66. When testifying on July 20, 2017, Marie had trouble recalling her name; could not remember her age or date of birth; could not independently name her children; and could not say where she was living at the time, when she had last lived with Robbie, or who she had been living with in Pennsylvania. As evidenced by Petitioner's Exhibit C, in fact, her cognitive functioning was compromised to the point that she could not provide a legible signature.

67. Most of Marie's answers that day were in response to leading questions and consisted primarily of "yes" and "no." In that mode, she said she remembered having a living trust with her husband and going to change it. She could not recall the Trust's distribution scheme, however, and nor could she identify what properties she had, let alone what she did with them in 2016.

68. Marie further claimed to recall going to make a will but had no memory of her discussions with Attorney Schwab. While she said "yes," she remembered telling someone that she wanted to have Renee removed as a beneficiary, moreover, she also said "no," she never intended to remove her.

69. After being advised that his mother had been largely non-communicative in Chambers, Robbie said she acted that way around strangers. Having taken that position, he could not then explain why she was the same way with her primary care physician or why, as he claimed, she was expressive with Attorney Schwab, whom she had never met before December of 2015.

70. Marie's doctors' objective and documented observations notwithstanding, Robbie claimed that he and his mother communicated in 2012, 2015, and 2016 as freely and easily as they always had and that he thus had no concerns about the progression of her Alzheimer's

71. Michelle Blatnick, Sylvia Roberts, Deborah Ross, and Ann Lucia Ross also indicated that Marie's cognitive and communication skills had not diminished. It was apparent, however, that none had engaged her in complex conversations in recent years; rather, their testimony indicated that each took it upon herself to lead the conversation, whether wittingly or unwittingly, and accept Marie's brief responses, coupled with her pleasant demeanor, as proof that all was well.

72. Were Marie to die with the 2016 will in effect, Robbie would become the sole owner of all her real property. Because he had Attorney Grady give him rights of survivorship to the Trust properties, they would not pass into his mother's estate, thereby nullifying her will's directive that he distribute any income from those held by purchase agreement among the five named beneficiaries. See Pet. Exh. B, ¶ 3. Under paragraph 5, moreover, he alone would inherit the Sigel property with no attendant obligations.

73. Having likewise made himself the default title holder of the ATV upon Marie's passing, Robbie would also have no legal obligation to sell the vehicle and distribute the proceeds under paragraph 6 of the will.

74. In addition to its affirmative beneficial provisions, the will eliminated Robbie's obligation to repay the $31,500.00 debt recorded by his father and which the Trust required him to pay into his parents' estate for final distribution.

Trial Court Opinion, 9/1/17, at 2–14.

Robbie concedes that Marie is partially unable "to meet essential requirements for her physical health and safety." Appellant's Brief, at 20. But he contests the finding of total incapacity and therefore the necessity for a

plenary guardian. Robbie points to the testimony of Dr. Lisa Witherite-Rieg, who said that Marie can independently dress, feed, toilet and shower herself. Robbie himself testified that Marie realizes the need and goes to the bathroom herself.

Our review of the record, including the trial court's thorough, well-reasoned Opinion, indicates there has been no abuse of discretion in finding Marie to be totally incapacitated. The court carefully weighed all evidence presented, including the entire testimony of Dr. Witherite-Rieg, Marie's primary care physician. Dr. Witherite-Rieg testified that, in her expert opinion, Marie was not capable of paying her bills starting in, at the latest, December 2015. See N.T., 6/14/17, at 30. Further, Dr. Witherite-Rieg observed that Marie's intellectual capacity would only continue to deteriorate. See id., at 37.

Additionally, the Orphans' Court heard from Marie herself who exhibited trouble recalling her name, her age, her children, or many other day-to-day facts of her life. See N.T., 7/20/17, at 12-16. Under these circumstances, we conclude that the record contains ample evidence to support the trial court's conclusion that Marie is an incapacitated person.

Turning to Robbie's final issue,[2] Robbie contends the trial court erred in ordering Marie removed from his home and instead placed in Renee's home in

_____

[2] Robbie's brief contains passages that could be construed as a challenge to the appointment of Renee and Kerrie as plenary guardians. These implied arguments are absent from the statement of issues presented, not fairly

Maryland. He highlights testimony that Marie preferred to live with Robbie. See Appellant's Brief, at 12-17.

We also find no abuse of discretion in the Orphans' Court's decision to order that Marie live with her daughters. The Court's Findings Nos. 59 to 64 provide support for the Court's decision, and the record supports these findings. For example, in Finding No. 59, the trial court determined that Marie was easily influenced by Robbie and his wife. Sheriff Carl Gotwald testified that he was sent to enforce the ordered relocation of Marie to Maryland. See N.T., 8/11/17, at 208. When he spoke with Marie, he informed her that he was there to take her to live at Renee's home in Maryland. See id., at 210.

Marie was initially willing to go, but then indicated that she was conflicted. See id. When Robbie's wife asked if she wanted to go to Maryland, Marie responded "no." Id. However, when Sheriff Gotwald asked Marie if she wanted to go, Marie responded, "yes." Id. Marie ultimately agreed to accompany the sheriff without any conflict. See id.

Further, the court found that Renee's home is a pleasant and happy environment for Marie. The court found that, in contrast to Robbie's home, Renee's home is not threatening to Marie's financial security:

> Since returning to Maryland, Marie has been surrounded by family and has enjoyed attending various gatherings and spending time with her daughters and grandchildren. She is happy in that

_____

contained within the issues in which they are present, and wholly undeveloped. We therefore find that Robbie has waived any such argument.

environment, just as she was happy living with her son and daughter-in-law.

...

Conversely Robbie and [his wife], though dutifully providing food, shelter, medical care, and supervision for Marie, rarely missed an opportunity to extract money from her and, through the use of a [power of attorney] and Robbie's substantial influence over her, assumed control of assets in such a way that they would have no obligation to relinquish the bulk of them even upon Marie's death.

Trial Court Opinion, 9/1/17, at 12, 15. These findings are also supported by competent evidence. See N.T., 7/20/17, at 133-134; N.T., 6/14/17, at 97-102; N.T., 8/11/17, at 175-205.

All of the trial court's factual findings are well supported by the record. Further, we can discern nothing unreasonable or improper with the trial court's reasoning. We therefore conclude that the trial court did not abuse it's discretion in removing Marie from Robbie's home and placing her with Renee. Robbie's second issue on appeal merits no relief.

As we conclude that neither of Robbie's issues on appeal merit any relief, we affirm the order removing Marie from Robbie's home and appointing Renee and Kerrie as plenary guardians.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date:  10/22/2019