J-S38032-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: JUSTINO PETACCIO, DECEASED | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: FRANCIS PETACCIO | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 635 EDA 2024 |

Appeal from the Order Entered November 16, 2023
In the Court of Common Pleas of Philadelphia County Orphans' Court at
No(s): 123 AP 2022

BEFORE: STABILE, J., BECK, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:     **FILED DECEMBER 24, 2024**

Appellant Francis Petaccio appeals from the order entered in the Court of Common Pleas of Philadelphia County Orphans' Court, which denied Appellant's petition to probate a handwritten document dated April 17, 2021, as the Last Will and Testament of Justino Petaccio ("decedent"), and sustaining the issuance of letters of administration for decedent's estate to John Petaccio and Richard Hoy, Esquire.[1] After a careful review, we affirm.

---

[*] Former Justice specially assigned to the Superior Court.

[1] As discussed *infra*, the Register of Wills issued letters of administration to decedent's father, Justino Petaccio, Sr. However, during the pendency of this action, Mr. Petaccio, Sr., died. The co-administrators of Mr. Petaccio, Sr.'s, estate, John Petaccio and Richard Hoy, Esquire, were substituted as respondents in the instant matter.

The relevant facts and procedural history are as follows: Decedent died on September 3, 2021, leaving no surviving spouse or children. He was survived by his father, Justino Petaccio, Sr., his sister, Ann Marie McNichols, and his two brothers, Appellant and John Petaccio. His intestate heir was his father, Mr. Petaccio, Sr. On September 15, 2021, Mr. Petaccio, Sr., filed a petition for grant of letters of administration with the Register of Wills. The petition was granted, and letters of administration were granted to him.

On or about October 1, 2021, Ruben Rosas offered a document, dated April 17, 2021, for probate averring the document was decedent's Last Will and Testament ("Will"). This handwritten document, which was later admitted at the hearing before the Orphans' Court, provided as follows in its entirety (verbatim):

> I, Justino Petaccio, being of sound mind leave this as my last will and testimony.
>
> I want Ruben Rosas to be the Executor of my will to carry out all my wishes.
>
> I want all my possessions to be sold and all my debtors to be paid. After of which the proceeds to be divided 1/3 to my brother, Frank Petaccio. 1/3 to my sister, Ann Marie McNichols. 1/3 to my close friend, Ruben Rosas.

Petitioners' Exhibit 1, dated April 17, 2021. The document contains the handwritten printed names, as well as signatures, of Anthony Tozzi, Mr. Rosas,

and Michael Loglisci as witnesses. The document contains the handwritten printed name of decedent with a signature of "JP"[2] above his name.

The Register of Wills advised Mr. Rosas that letters of administration had been granted and an informal caveat had been filed by Mr. Petaccio, Sr. On October 7, 2023, Mr. Petaccio, Sr., filed a formal caveat alleging the April 17, 2021, Will was forged and fraudulent. The Register of Wills held a caveat hearing, and on January 24, 2022, the Register of Wills issued a decree sustaining the caveat and allowing the letters of administration issued to Mr. Petaccio, Sr., to remain in full force and effect.

Appellant appealed the decision of the Register of Wills. Specifically, on February 11, 2022, Appellant filed a petition for citation seeking to be appointed the executor of decedent's estate, requesting decedent's April 17, 2021, Will be accepted to probate, and requesting letters of administration previously granted to Mr. Petaccio, Sr., be revoked.

Appellant averred decedent executed his Will on April 17, 2021, naming Mr. Rosas as executor and dividing his estate among Mr. Rosas, Ms. McNichols (decedent's sister), and Appellant (decedent's brother). Appellant noted that on October 1, 2021, Mr. Rosas, along with two witnesses to the Will, Mr. Tozzi and Mr. Loglisci, appeared at the Register of Wills with the Will. However, as indicated *supra*, the Register of Wills informed Mr. Rosas that letters of

_____

[2] The "JP" is essentially one small circle and one big circle with lines at the bottom.

administration for decedent's estate had already been issued to Mr. Petaccio, Sr., who filed a petition alleging decedent had no Will. Appellant averred the Register of Wills erred in failing to accept the April 17, 2021, Will for probate.

On February 25, 2022, Mr. Petaccio, Sr., filed a response indicating the April 17, 2021, Will is a forgery.[3] Alternatively, Mr. Petaccio, Sr., averred decedent was not of sound mind when the Will was allegedly signed by him, and/or the execution of the instrument was procured by undue influence.

On June 20, 2023, the Orphans' Court held a hearing on the petition. Michael Loglisci testified decedent's nickname was "Gussy," and he knew him since the first grade. N.T., 6/20/23, at 10. Mr. Loglisci testified he saw decedent "very often." *Id.* at 11. He indicated that he, decedent, and other "old friends" would get together monthly to play "card games." *Id.* He clarified that "old friends" included Mr. Rosas, Mr. Tozzi, Joey Rounbehler, Jay Barzone, and Stevie Cisco. *Id.* at 13. Mr. Loglisci acknowledged that decedent was the owner of a company, Tri-State Paper; however, Mr. Loglisci never worked for decedent. *Id.* at 12. Rather, he and decedent were personal friends. *Id.*

Mr. Loglisci indicated that, at some point prior to decedent's death, decedent told him that he was going into the hospital. *Id.* at 12-13. Mr.

---

[3] As indicated *supra*, Mr. Petaccio, Sr., subsequently died during the pendency of this matter. John Petaccio and Richard Hoy, Esquire, were substituted as respondents in the instant matter.

Loglisci relevantly testified as follows upon questioning by Appellant's attorney:

Q. Now, at some point during the time that Gussy, [the decedent], was in the hospital, did there become a discussion about a Will?

A. Prior to him going to the hospital.

Q. And was a Will prepared?

A. Yes.

Q. Did you sign that Will?

A. Yes.

Q. Do you know who else signed that Will?

A. Yes.

Q. Can you tell us those names?

A. The other signatures, Ruben Rosas, Anthony Tozzi, and obviously [the decedent].

[At this point the Will was admitted into evidence as P-1.]

Q. Sir, you've been handed what is marked as P-1, and I know that's a difficult letter for me to say. So, P, as in Peter, 1.

A. Okay.

Q. Please take a look at that.

A. Mm-hmm.

Q. Do you recognize it?

A. Yes.

Q. Okay. Is that the Will that was prepared with regard to [the decedent]?

A. Yes.

Q. Do you see the date on that document?

A. Yes.

Q. Could you please tell the Court the date of that document?

A. 4/17/21.

Q. Do you see to the bottom left the names of the three witnesses?

A. Yes.

Q. Could you name those three witnesses for me?

A. Anthony Tozzi, Ruben Rosas, and Michael Loglisci, me.

Q. Is that your signature, sir?

A. Yes.

Q. And that was also done on 4/17 of '21?

A. Yes.

Q. Is this the Will that [the decedent] had discussed with you and the two other signers?

A. Yes.

*Id.* at 13-16.

Thereafter, while decedent was in the hospital, he died on September 3, 2021. *Id.* at 12-13. Mr. Loglisci confirmed that he, Mr. Rosas, and Mr. Tozzi took the April 17, 2021, Will to the Register of Wills on October 1, 2021; however, the Register of Wills informed them that Mr. Petaccio, Sr., had been previously granted letters of administration and stated there was no Will. *Id.* at 17. Mr. Loglisci testified that, before the Register of Wills, he attended a hearing at which he testified decedent prepared the April 17, 2021, Will, and Mr. Loglisci signed it as a witness. *Id.* at 17-18.

Mr. Loglisci testified that decedent and Mr. Petaccio, Sr., had "no relationship." *Id.* at 19. He testified he had "no doubt whatsoever" that decedent signed the April 17, 2021, Will because he was present when decedent did so. *Id.* at 20.

On cross-examination, Mr. Loglisci indicated he was not paid in exchange for his testimony. *Id.* Mr. Loglisci indicated the Will was signed at approximately 6:30 p.m. on April 17, 2021, while the group was at Mr. Tozzi's

home. *Id.* at 22. Mr. Loglisci testified he arrived early for the card game, which was set to start at 7:30 p.m., because he wanted to see Mr. Rounbehler, and decedent arrived in the same car as Mr. Rounbehler. *Id.* at 27. He indicated decedent "looked fine, looked great." *Id.* The men began to converse, and Mr. Rounbehler told them he had advanced cancer, but he was satisfied because he had "all his affairs in order." *Id.* at 32. Decedent told the group that he would be going into the hospital in a few days, but he had not yet prepared a Will. *Id.* Decedent "decided it [wouldn't] hurt to have one[,] [s]o they sat down at the kitchen table right there and drew up this Will right here." *Id.*

Mr. Loglisci testified that Mr. Tozzi wrote out the Will, but decedent told him what to write. *Id.* at 33. After decedent and the witnesses signed it, decedent gave it to Mr. Rosas, who was named as the executor. *Id.* at 34. Upon questioning by the Orphans' Court, Mr. Loglisci testified:

> THE COURT: Mr. Loglisci, I just want to ask you something. You said that they came up with something. What do you mean by that?
> THE WITNESS: They came up with how [decedent] wanted his Will to read.
> THE COURT: Okay. So, they came up with the words? Well, who put the words together?
> THE WITNESS: I guess a conversation between [Mr. Tozzi] and [decedent], you know, like the standard language.

*Id.* at 35.

Ruben Rosas testified that he knew decedent his entire life, and decedent's nickname was "Gussy." *Id.* at 38. Mr. Rosas testified he,

- 7 -

decedent, Mr. Loglisci, Mr. Rounbehler, Mr. Tozzi, and James Byberry were lifetime friends. *Id.* Mr. Rosas confirmed the men, including himself and decedent, met monthly to play cards, and he was aware of decedent's business, Tri-State Paper. *Id.* at 39.

Mr. Rosas testified the men met on April 17, 2021, for a card game at Mr. Tozzi's house, and on that night, decedent's Will was prepared. *Id.* at 40-41, 49. Mr. Rosas testified he saw decedent sign the Will, and he, Mr. Tozzi, and Mr. Loglisci signed as witnesses. *Id.* at 42. Mr. Rosas indicated decedent went into the hospital in May of 2021, and he died on September 3, 2021, while he was in the hospital. *Id.* at 43. Thereafter, Mr. Rosas, along with Mr. Loglisci and Mr. Tozzi, took the Will to the Register of Wills and swore under oath that the document was decedent's Will and signature. *Id.* at 44.

Mr. Rosas testified that decedent "hated" his father, Mr. Petaccio, Sr., as well as his brother, John Petaccio. *Id.* at 45. However, he got along with his brother, Appellant, as well as his sister, Ms. McNichols. *Id.* at 45-46. Mr. Rosas admitted he asked to be removed as the executor as provided by the April 17, 2021, Will. *Id.* at 46. He indicated he has Parkinson's disease, and he can't handle the stress of being an executor. *Id.* Mr. Rosas denied that anyone paid him to give his testimony before the Orphans' Court; however, he indicated John Petaccio offered him money to not testify before the Orphans' Court. *Id.* at 47-48.

On cross-examination, Mr. Rosas testified he drove Mr. Rounbehler and decedent to Mr. Tozzi's house for the April 17, 2021, card game. ***Id.*** at 51. He was not aware that a Will had been drafted until decedent "handed [him] the Will and said to [him], I want you to sign this. I want you to be the executor if something happens to me." ***Id.*** at 52. He admitted he did not "hear [decedent] giving the instructions to anybody about the Will." ***Id.*** He also denied either knowing how the topic of a Will was brought up or being present for any discussions with regard thereto before decedent handed him the Will. ***Id.***

Mr. Rosas specifically admitted he did not know whether the Will was prepared in advance and brought to Mr. Tozzi's house, or whether the Will was prepared at Mr. Tozzi's house in decedent's presence. ***Id.*** at 57. He testified he was not involved in the preparation of the Will, he did not hear decedent dictating it, and he was not involved in any other manner until decedent handed it to him to sign just before the card game started. ***Id.*** at 57-58. After he signed it, decedent told him to keep it. ***Id.*** at 57. Mr. Rosas denied that Mark Guarnere was present at Mr. Tozzi's house on April 17, 2021. ***Id.***

Mr. Rosas admitted that, after decedent died, he took the April 17, 2021, Will to the Register of Wills; however, after they would not probate it, he "decided to back out of [the matter] altogether." ***Id.*** Mr. Rosas indicated he signed a release withdrawing his request for letters of testamentary as to the Will. ***Id.*** at 54. He noted that he intends for the release to include any right

he might have as a beneficiary under the Will. *Id.* He indicated he has been "stressed to death" about the whole matter, and he wants nothing to do with the Will. *Id.* at 55.

Ann Marie McNichols testified she had a close relationship with her brother, decedent, and she had a copy of his April 17, 2021, Will. *Id.* at 62. She testified she had a "good relationship" with her father, Mr. Petaccio, Sr., and before he died, Ms. McNichols gave him a copy of decedent's April 17, 2021, Will. *Id.* at 63. Ms. McNichols indicated she told Mr. Petaccio, Sr., that Mr. Rosas had given her a copy of the Will. *Id.* at 65.

Ms. McNichols admitted that she is a named beneficiary in the Will, and her brother, John Petaccio, is not a named beneficiary. *Id.* She did not give a copy of the April 17, 2021, Will to John Petaccio. *Id.* She, as well as decedent, were estranged from John Petaccio. *Id.* Ms. McNichols testified Appellant was estranged from their father, as well as their brother, John Petaccio; however, Appellant had a close relationship with decedent. *Id.* at 71-72.

Mark Guarnere testified he worked at Tri-State Paper as the head of the sales division when decedent was alive and, after decedent's death, Mr. Petaccio, Sr., appointed him as the president of the company. *Id.* at 85, 89. He testified he was at Mr. Tozzi's house on April 17, 2021, for the card game. *Id.* at 84. He arrived at approximately 8:00 p.m., and during the evening, he heard no conversation about an alleged Will. *Id.* at 85.

Mr. Guarnere indicated that, after the April 17, 2021, card game, he had conversations with decedent at the office about his physical condition. *Id.* He noted decedent did not discover that he was going into the hospital until May 1 or 2, 2021, when he received a phone call from a nurse explaining that he needed heart valve replacement surgery. *Id.* at 86. The surgery was initially scheduled for May 10, 2021, but then changed to May 17, 2021. *Id.*

Mr. Guarnere testified the following conversation occurred between him and decedent immediately after the nurse called him on May 1 or 2, 2021:

> I said, "Do you have your affairs in order, [decedent]?" He said, "No. I'm going to go see the attorney tomorrow." And I explained to him I handled my business, that I had to go to an attorney, get a will, and stuff like that. So, the next day, I said, "How did the meeting go with the attorney?" [Decedent said,] "I didn't go."

*Id.* Mr. Guarnere testified decedent never told him he had a will, and, in fact, decedent specifically told him he did not have a will. *Id.*

Mr. Guarnere testified decedent had the heart valve replacement surgery on May 17, 2021; however, he never left the hospital and died on September 3, 2021. *Id.* at 87. After decedent's death, Mr. Rosas came to the Tri-State Paper office and informed Mr. Guarnere that he now had control of the company. *Id.* Mr. Guarnere told Mr. Rosas that vendors needed to be paid, so Mr. Rosas signed decedent's name on several checks after decedent's death. *Id.* at 88, 99. He noted Mr. Rosas "put himself on the payroll" and made checks out to himself. *Id.*

- 11 -

Mr. Guarnere indicated that, thereafter, Mr. Petaccio, Sr., stopped by the office with "a gold seal to state that he was executor of [decedent's] estate." *Id.* Mr. Guarnere testified that, after Mr. Petaccio, Sr., showed him the gold seal, Mr. Rosas did not write any more checks for Tri-State Paper. *Id.* at 94.

Mr. Guarnere indicated that, when decedent was alive, Tri-State Paper had annual sales of $6 million; however, after his death, the annual sales fell to approximately $5.5 million. *Id.* at 89, 91. He noted decedent owned a warehouse, which Mr. Guarnere valued at $1.5 million. *Id.* at 89-90. The warehouse is located on North 3rd Street. *Id.* at 103. He indicated he assumed the warehouse was still an asset of decedent's estate. *Id.* at 91. Mr. Guarnere denied knowing that, when Mr. Petaccio, Sr., went to the Register of Wills to get the letters of administration, he informed the Register of Wills that decedent's entire estate was valued at $200,000. *Id.* at 92.

Mr. Guarnere indicated that, when Mr. Petaccio, Sr., appointed him as president of the company, he also appointed his son, John Petaccio, as CEO of the company. *Id.* at 95, 99. He confirmed John Petaccio took a salary after he was appointed as CEO. *Id.* at 101.

Richard Hoy, Esquire, testified he has done legal work for Mr. Petaccio, Sr., and decedent during the past twenty-five years. *Id.* at 104. He testified he is very familiar with decedent's signature, and he did not recognize the signature on the April 17, 2021, Will as belonging to decedent. *Id.* at 105.

He indicated the signature on the April 17, 2021, Will was "not [decedent's] signature whatsoever." *Id.* at 108.

Mr. Hoy testified he took various documents out of his legal files and gave them to John Petaccio. *Id.* These documents, which were shown to Mr. Hoy on direct examination and identified as respondents' Exhibit R-2, included an IRS document, a Pennsylvania corporate tax report, and various checks, which bore decedent's signature. *Id.* at 105-08. Mr. Hoy indicated decedent's signature on these documents was not similar to the signature on the April 17, 2022, Will. *Id.*

On cross-examination, Mr. Hoy indicated he had "probably over 500, maybe thousands" of documents and checks bearing decedent's signature. *Id.* at 109. He noted the bank also has several documents and checks with decedent's signature, and these documents could also be compared to decedent's alleged signature on the April 17, 2021, Will. *Id.* The following relevant exchange occurred on Mr. Hoy's cross-examination:

> Q: Okay. So, it's your opinion, as his lawyer for many years, that that's not his signature. That's your testimony, correct?
>
> A: That's my opinion. And all of the signatures with every other piece of paper that I've seen, they're not comparable whatsoever to this thing on the Will.
>
> Q: Okay. They're not comparable is what you said?
>
> A: Not comparable.
>
> Q: So, are you familiar with the fact that as people age their signature changes?
>
> A: I'm talking about taking this signature and like a month before this.

- 13 -

*Id.* at 110.

Mr. Hoy testified that the signature on the April 17, 2021, Will appears to be nothing more than "a very big circle." *Id.* at 111. He acknowledged that a person's signature can change because of deteriorating physical health, age, and the position in which he or she is sitting. *Id.*

In any event, Mr. Hoy reiterated that the signature purporting to be that of decedent on the April 17, 2021, Will is "a different signature" than the signature on the many documents signed by decedent in Mr. Hoy's possession. *Id.* at 115. Appellant's counsel asked Mr. Hoy if it benefits him to testify in favor of respondents in this matter, and Mr. Hoy responded, "It benefits because I'm their lawyer, and I'm telling the truth." *Id.* He testified he is "not biased," and throughout his legal career, he has tried to remain unbiased and truthful. *Id.*

At the conclusion of the hearing, the Orphans' Court asked respondents' counsel whether the business or warehouse were on the market for sale. *Id.* at 134. Respondents' counsel indicated, "No, not at all." *Id.* The Orphans' Court then directed the parties to submit proposed findings of fact and conclusions of law. The Court indicated it would take the matter under advisement.

On September 11, 2023, Appellant filed a motion to prevent the sale and/or dissipation of any assets of decedent's estate. Appellant averred that, after the June 20, 2023, hearing, Appellant discovered the warehouse was

listed for sale on the Internet. Accordingly, Appellant sought to prevent the sale of the warehouse or any other property from decedent's estate.

On September 25, 2023, the Orphans' Court held a hearing on Appellant's motion. During the hearing, respondents' counsel represented to the Orphans' Court that "the property has not been listed for sale." N.T., 9/25/23, at 15. Respondents' counsel further indicated that neither John Petaccio nor Mr. Hoy had signed any agreements to sell the property. *Id.* at 16. Respondents' counsel noted that, if the property was listed for sale unbeknownst to him, he was certain neither respondent had signed an agreement to sell the property. *Id.* Respondents' counsel confirmed his clients had no agreement with any realtor or anyone else to sell the business or warehouse. *Id.* at 18. Additionally, Mr. Hoy informed the Orphans' Court that neither the business nor the warehouse had been listed for sale by respondents. *Id.* at 32.

The Orphans' Court denied Appellant's motion; however, as to Appellant's underlying petition to admit the April 17, 2021, Will for probate, the Orphans' Court indicated it wanted to hear testimony from Mr. Tozzi. Accordingly, on November 1, 2023, the Orphans' Court held a second hearing as to the merits of the underlying estate claim.

Mr. Tozzi testified he lives in Cherry Hill, New Jersey, and he knew decedent, as well as his father. N.T., 11/1/23, at 6. Mr. Tozzi indicated he "grew up" with decedent in Philadelphia, and he remained friends with him

during adulthood. *Id.* at 8. Mr. Tozzi acknowledged that decedent owned a business, Tri-State Paper. *Id.* at 9.

Mr. Tozzi testified he has a clear memory of April 17, 2021. *Id.* at 10. He indicated that, on that day, he and his friends, including decedent, Mr. Loglisci, Mr. Rosas, Mr. Rounbehler, and Mr. Barzone, met at his house for a card game. *Id.* He testified that decedent, Mr. Rosas, and Mr. Rounbehler arrived at his house together prior to the start of the card game. *Id.* at 12. Mr. Tozzi indicated the men went into his den, and he walked in and out of the den while bringing in food from the kitchen. *Id.* at 13. He overheard decedent say that he was getting ready to have heart surgery, and Mr. Tozzi knew that Mr. Rounbehler had stage 4 cancer. *Id.* at 14-15.

At some point, decedent, Mr. Rosas, and Mr. Loglisci came into the kitchen, and decedent asked Mr. Tozzi if he would retrieve a pen and paper. *Id.* at 16. Decedent then asked Mr. Tozzi to write a Will for him. *Id.* Mr. Tozzi testified he did not find it odd for decedent to make this request of him since Mr. Tozzi was always the person who kept score during card games and placed the bets when they went to the track. *Id.* He indicated that he was the "pen and paper guy" of the group. *Id.* Regarding the Will, Mr. Tozzi testified he wrote down "verbatim" what decedent dictated to him. *Id.* at 17.

When shown Plaintiff's Exhibit 1 (the April 17, 2021, Will), Mr. Tozzi confirmed it was the Will, which he penned for decedent. *Id.* The relevant exchange occurred upon questioning by Appellant's counsel:

Q. The words that are written on here, did you write them based on what you wanted, or did someone direct you to write these words?

A. No, [decedent] dictated exactly what he wanted.

Q. I want to be clear about that. [Decedent], the son, told you what to write down?

A. Absolutely.

Q. And you wrote those words down verbatim, word for word?

A. I did.

Q. And these are the words that he told you to write down?

A. Yes, they are.

Q. Did you try to influence him in any way as to what to say?

A. No, not at all.

Q. Did any of the other individuals who were there attempt to tell him what to do, or how to write this?

A. No, because you could never tell [decedent] anything, so that wouldn't, you know….

*Id.* at 18-19.

Mr. Tozzi indicated that he saw decedent sign the April 17, 2021, Will above his printed name on the signature line. *Id.* at 19. Mr. Tozzi testified he printed the names of the witnesses. *Id.* He signed the Will as a witness and observed the other two witnesses, Mr. Rosas and Mr. Loglisci, sign the document. *Id.* Mr. Tozzi testified that, after he signed the document, he went to the kitchen to finish preparing the food, and he was unsure as to what happened to the document. *Id.* at 21.

On cross-examination, Mr. Tozzi testified he, decedent, Mr. Rosas, and Mr. Loglisci were childhood friends. *Id.* at 26. Mr. Tozzi testified Mr. Rosas and Mr. Loglisci were in the kitchen and present when decedent told him what

to write for the Will. *Id.* at 27-28. He testified Mr. Rosas and Mr. Loglisci were also present when decedent signed the document. *Id.* at 27.

Mr. Tozzi denied knowing that Mr. Rosas previously testified he was not present when decedent dictated his Will and signed it. *Id.* However, he was aware that Mr. Rosas later renounced his right to be the executor. *Id.* Mr. Tozzi acknowledged decedent had an attorney, who represented him in several matters. *Id.* at 28. Mr. Tozzi testified that he did not know why decedent, who could read and write, didn't just handwrite the Will himself. *Id.*

Mr. Tozzi indicated that, after he finished writing the Will, he is unsure whether anyone read it back to decedent. *Id.* at 29. Mr. Tozzi reiterated that, after he drafted and witnessed the Will, he did not see it again until after decedent's death. *Id.* He testified decedent took it off the kitchen table. *Id.* Mr. Tozzi denied that decedent had been drinking alcohol when he dictated the Will, and he looked "normal" to Mr. Tozzi. *Id.* at 30-31.

By order and opinion entered on November 16, 2023, the Orphans' Court denied Appellant's request to admit the April 17, 2021, Will to probate and dismissed Appellant's appeal from the Register of Wills. Appellant filed an initial motion and amended motion for reconsideration, which the Orphans'

Court denied.[4]  On Monday, December 18, 2023, Appellant filed a timely notice

of appeal.  All Pa.R.A.P. 1925 requirements have been met.

On appeal, Appellant sets forth the following issues in his "Statement of

the Questions Involved" (verbatim):

1. Did the Trial Court err by considering Respondents' exhibits marked collectively as R-2, purporting to be exemplars of the Decedent's handwriting, because these documents were never formally admitted into evidence and are therefore not part of the record?

2. Did the Trial Court err by finding that the Respondents proved by clear and convincing evidence that the signature on the Decedent's Last Will and Testament was a forgery since the only evidence it considered was the lay opinion of Richard Hoy, Esquire, and Respondents' exhibits marked R-2 which were never formally moved into evidence?

3. Did the Trial Court err by failing to grant Petitioner's Supplemental Motion for Reconsideration in which the Petitioner learned after the Trial Court issued its Decree on November 16, 2023, that the Respondents' sole witness, Richard Hoy, Esquire, had previously testified falsely to the Court regarding the estate's real property located at [****] North 3rd Street, Philadelphia, PA, not being listed for sale?

Appellant's Brief at 3 (suggested answers omitted).

Initially, we note that, on appeal from the Register of Wills' decree

refusing to admit a will to probate, the Orphans' court must consider the facts

---

[4] Pursuant to Pennsylvania's Orphans' Court Rules, "no exceptions or post-trial motions may be filed to any order or decree of the court."  Pa.O.C. 8.1. However, "a party may request the court to reconsider any order that is final under Pa.R.A.P. 341(b) or 342, or interlocutory orders subject to immediate appeal under Pa.R.A.P. 311[.]" Pa.O.C. 8.2.  Here, the order at issue determined the validity of a will as provided for under Pa.R.A.P. 342(a)(2), and Appellant was permitted to file a motion for reconsideration.

presented and "either dismiss the petition, grant an issue in case of a substantial dispute, or set aside the probate." *In re Estate of Luongo*, 823 A.2d 942, 951 (Pa.Super. 2003) (quotation marks and quotation omitted). With respect to this Court's standard and scope of appellate review in will contests, the Orphans' Court decision will not be reversed unless there has been an abuse of discretion or a fundamental error in applying the correct principles of law. *See id.*

Appellant first contends the Orphans' Court erred in considering respondent's exhibit identified as R-2, which included decedent's IRS document, decedent's Pennsylvania corporate tax report, and various checks, which bore decedent's signature. Specifically, Appellant contends these items were not formally introduced and admitted into evidence, and, therefore, the Orphans' Court erred in considering the documents in determining that decedent's signature on the April 17, 2021, document was a forgery.

In the case *sub judice*, during the direct examination of Mr. Hoy, respondent's attorney indicated respondents had an exhibit, which they would like "to put up." N.T., 6/20/23, at 105. The Orphans' Court indicated the exhibit would be marked as R-2. *Id.* Appellant's attorney did not object to the exhibit. *Id.* The following exchange then occurred during respondents' attorney's questioning of Mr. Hoy:

> Q. Mr. Hoy, I gave you—I handed up what we have as Exhibit R-2, which is a series of documents with original signatures of [decedent]. Looking at P-1, which is the will in question, does the

signature on that document match any of the signatures on the original documents that we handed up to you?

A. No.

Q. The documents that we're looking at, the first one is an IRS file document. The second one is a Pennsylvania signature authorization for corporate tax report; same with the third. We have a Citizens Bank check, and it was a deposit, a signature on Huntingdon Vally Bank, a letter to a Mary Jones, and several more checks. None of those signatures match the signature on the will in question; is that correct?

[APPELLANT'S ATTORNEY]: Now I'll enter my objection, Your Honor, because I'm not sure how he's being called. He has no training as an expert. He has no training with [regard to] signatures, and, as well, all the documents they're talking about have never been provided to our side, to the movants.

THE COURT: Did you ask for them?

[APPELLANT'S ATTORNEY]: I believe we asked for them, Judge, in the beginning of this matter and, actually, all exhibits were supposed to be downloaded and filed with the Court pursuant to pretrial and trial policies and procedures.

[RESPONDENTS' ATTORNEY]: That was done. We gave it to the Court. We got it, and we sent it right to the Court.

THE COURT: So, you sent them along with everything else?

[RESPONDENTS' ATTORNEY]: Yes.

THE COURT: All right. And I think they were in our file.

[RESPONDENTS' ATTORNEY]: And—

[APPELLANT'S ATTORNEY]: And if they actually are—

THE COURT: One at a time.

[RESPONDENTS' ATTORNEY]: And just to clarify, the trier of fact, being you, is the one who makes the determination as to whether or not the signature is fraudulent. There's no requirement we hire a handwriting expert. There is no such thing. There are people out there that know how to analyze handwriting, but it's up to the trier of fact to make that final determination. So, I'm asking Your Honor to look at what was handed up, match that to the documents, and make a determination based on that.

THE COURT: But I think you're essentially testifying—Mr. Hoy is testifying as a fact witness being his former attorney.

[RESPONDENTS' ATTORNEY]: Right.

THE COURT: And whether he recognizes that as—the signature seems familiar to him. That's all he's asking to do in this situation. He's not being called as an expert.

[RESPONDENTS' ATTORNEY]: Okay.

THE COURT: I will not treat him as such.

[RESPONDENTS' ATTORNEY]: Right. Just somebody who's been familiar with the signature of [decedent] over the years.

THE COURT: Correct.

Q. And it's your opinion, looking at that [Mr. Hoy], that's not his handwriting?

A. Not his signature whatsoever.

THE COURT: Can I just ask, Mr. Hoy, did you prepare these documents that were provided to us or at least the series of documents that were [identified as R-2].

THE WITNESS: At the beginning of the proceedings when the Court asked us for it, I helped get all of them together, which there's hundreds of them.

THE COURT: These [documents identified as R-2] are from your files then?

THE WITNESS: Yes.

THE COURT: Thank you. That's all I have.

*Id.* at 105-09.

Subsequently, the Orphans' Court noted in its Opinion that it "reviewed the exemplars on the bench at the June 20, 2023, hearing" and compared decedent's signature on the documents identified as Exhibit R-2 to the alleged signature of decedent on the April 17, 2021, Will. Orphans' Court Opinion, filed 11/16/23, at 9 n.3.

Initially, before we address whether the Orphans' Court could properly consider Exhibit R-2, we must determine whether Appellant has waived his

argument. Issues not raised in the lower court cannot be raised for the first time on appeal. Pa.R.A.P. 302(a). It is clear that, while Appellant objected to Exhibit R-2 on the grounds the documents had not been provided to him prior to trial, there is no indication Appellant otherwise objected to the documents. However, because the exhibit was not formally moved into and admitted into evidence, Appellant did not have a corresponding opportunity to formally object.

Regardless, Mr. Hoy was asked to examine and testify about Exhibit R-2 as if it was admitted into evidence, and it became apparent during the hearing that the Orphans' Court intended to use Exhibit R-2 as record evidence. Still, Appellant did not object on the grounds the exhibit had not been formally introduced and admitted into evidence. Thus, Appellant's objection to Exhibit R-2 on appeal is waived. *See Green v. Green*, 69 A.3d 282 (Pa.Super. 2013) (holding the appellant waived argument the trial court could not consider purported exhibit listing personal property with valuations on the basis it was not formally admitted into evidence where the issue was not raised during the hearing and the appellant was put on notice the court intended to consider the purported exhibit).[5]

_____

[5] In any event, assuming, *arguendo*, Appellant properly preserved this claim, and the Orphans' Court erred in considering Exhibit R-2, it is clear that such error would not constitute grounds for a new hearing. "A new trial is not warranted merely because some irregularity occurred during the trial or another trial judge would have ruled differently; the moving party must

*(Footnote Continued Next Page)*

Appellant next contends respondents failed to demonstrate by clear and convincing evidence that decedent's signature on the April 17, 2021, Will was a forgery.

> In a will contest, the hearing judge determines the credibility of the witnesses. The record is to be reviewed in the light most favorable to appellee, and review is to be limited to determining whether the [Orphans' Court's] findings of fact were based upon legally competent and sufficient evidence and whether there is an error of law or abuse of discretion. Only where it appears from a review of the record that there is no evidence to support the court's findings or that there is a capricious disbelief of evidence may the court's findings be set aside.

*In re Estate of Schumacher*, 133 A.3d 45, 49-50 (Pa.Super. 2016) (citation omitted).

Moreover,

> When the issue of a forgery is raised, the claimant or contestant of the will has the burden of proving the existence of a forgery by clear and convincing evidence. Also, we note that because forgery

_____

demonstrate to the trial court that he or she has suffered prejudice from the mistake." *Rettger v. UPMC*, 991 A.2d 915, 923-24 (Pa.Super. 2010) (quotation and quotation marks omitted). As the Orphans' Court notes, in Exhibit P-3 (a lease agreement that was signed by decedent), "Appellant presented his own exemplar of decedent's signature, which closely resembles the signatures which appear on Respondents' exemplars [identified as Exhibit R-2]." Orphans' Court Opinion, filed 11/16/23, at 9 n.3. In fact, on cross-examination, Mr. Hoy testified the document identified as P-3 contained decedent's signature, which looked identical to the decedent's signature on the IRS form included in Exhibit R-2. N.T., 6/20/23, at 114. Thus, aside from the documents in Exhibit R-2, the Orphans' Court considered and compared decedent's signature on other documents, including Appellant's Exhibit P-3, to his purported signature on the April 17, 2021, Will. *See Pittsburgh Construction Co. v. Griffith*, 834 A.2d 572 (Pa.Super. 2003) (holding erroneous consideration of evidence is harmless if it is cumulative of other properly admitted evidence).

presents an issue of fact, the resolution of the issue necessarily turns on the court's assessment of the witnesses' credibility.

*In re Estate of Presutti*, 783 A.2d 803, 806 (Pa.Super. 2001) (citations omitted).

In the case *sub judice*, the Orphans' Court was aware of the respective parties' arguments and concluded that the signature purporting to be that of decedent on the April 17, 2021, Will was fraudulent. Specifically, the Orphans' Court found credible the testimony of Mr. Hoy, who was decedent's lawyer for many years. Orphans' Court Opinion, filed 11/16/23, at 9. The Orphans' Court determined that, because Mr. Hoy witnessed decedent signing transactional documents during his "decades-long business relationship" with him, Mr. Hoy was familiar with decedent's signature. *Id.* at 7-9. Accordingly, the Orphans' Court found credible Mr. Hoy's testimony that the signature purporting to be that of decedent on the April 17, 2021, Will was not consistent with decedent's signature on many documents, including those identified as Exhibit R-2 and Exhibit P-3.

Moreover, the Orphans' Court explained that it examined the exemplars provided by Appellant and respondents, and the court compared the signature of decedent on these exemplars to the signature on the April 17, 2021, Will. The Orphans' Court held "the signature on the [April 17, 2021,] Last Will and Testament bears scant resemblance to decedent's signature on his contemporaneous legal documents." Orphans' Court Opinion, filed 11/16/23, at 10.

Furthermore, the Orphans' Court indicated that it did not disregard the testimony of Mr. Rosas and Mr. Loglisci; however, the Orphans' Court concluded they were "simply mistaken" in their recollection of decedent signing the April 17, 2021, Will. ***Id.*** at 10-11. The Orphans' Court further indicated that, while Mr. Tozzi was generally credible in his testimony, his testimony that decedent signed the April 17, 2021, Will was "inaccurate," and a reflection of what Mr. Tozzi wished had happened. ***Id.*** at 11.

We conclude the Orphans' Court's factual findings are supported by the record, and it was within the Orphans' Court's purview to make the necessary credibility determinations. ***See In re Estate of Presutti***, ***supra***. Given our standard of review and viewing the evidence in the light most favorable to respondents (the appellees), we conclude respondents proved forgery of decedent's signature on the April 17, 2021, Will by clear and convincing evidence. ***See In re Estate of Schumacher***, ***supra***. Thus, we decline to set aside the Orphans' Court's findings and conclusions in this regard.

In his final claim, Appellant insists the Orphans' Court abused its discretion in finding Mr. Hoy's testimony credible, particularly considering evidence that came to light after the hearing. Specifically, Appellant contends that "in this case, the only evidence of forgery came from the lay opinion of Mr. Hoy. [However,] his lay opinion alone is woefully inadequate to satisfy the clear and convincing standard." Appellant's Brief at 26. In this vein, Appellant asserts "Mr. Hoy made repeated, emphatic representations that Tri-State's

property was not listed for sale….Those representations were false." **Id.** at 25.

Accordingly, Appellant suggests that since "respondent's sole witness alleging forgery was subsequently discovered to have offered numerous, repeated and material misrepresentations to the Court, it cannot be proper to have that sole witness be deemed 'credible' to justify finding that respondents have met [their] burden to prove forgery." **Id.** at 26. Thus, Appellant contends the Orphans' Court should have ordered a new hearing to reconsider the credibility of witnesses, as well as the weight to be afforded to each witnesses' testimony.

Although Appellant has cited no case law, his claim appears to be one challenging the weight of the evidence supporting the Orphans' Court's decision.[6] It is well-settled that:

> Appellate review of a weight claim is a review of the [Orphans' Court's] exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. Because the [Orphans' Court] judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the [Orphans' Court] judge when reviewing an [Orphans'] Court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

---

[6] Appellant sufficiently preserved this claim when he presented it in his motion for reconsideration and Rule 1925(b) statement. **See In re Estate of Smaling**, 80 A.3d 485 (Pa.Super. 2013) (*en banc*).

*In re Estate of Smaling*, 80 A.3d 485, 490 (Pa.Super. 2013) (*en banc*)

(quotation omitted).

In rejecting Appellant's claim raised in his motion for reconsideration,

the Orphans' Court explained the following:

> [Appellant] presents evidence to challenge the credibility of Richard Hoy, Esq., who served as a fact witness for the respondents as to the authenticity of decedent's signature on the Last Will and Testament. This evidence consists of a brokerage agreement dated May 23, 2023, filed with the Tri-State's December 4, 2023, Application to Employ U.S. Realty Associates to sell the real property at [****] N. 3rd Street. [Appellant] contends that this brokerage agreement is proof that counsel for respondents, John Raimondi, and [Mr.] Hoy, made numerous "affirmative, material misrepresentations" to the [Orphans'] Court regarding the listing of the Property for "sale." Based on this evidence, [Appellant] asks the [Orphans'] Court to reconsider its finding that Mr. Hoy was credible and its reliance on his testimony in finding that…[decedent] did not sign the Last Will and Testament.
>
> ***
>
> The [Orphans'] Court did not make a finding that Mr. Hoy's prior testimony on June 20, 2023, was as a whole "credible," but stated that it found Mr. Hoy credible as to the specific issue of authenticity of decedent's signature. It was, by no means, a general ruling on credibility and, as a fact-finder, the Court is free to choose to believe or disbelieve any portion of a witness's testimony. The matter of credibility of a witness, that, is, whether his testimony is believable in whole or in part, is solely for the fact finder.
>
> The [Orphans'] Court found Mr. Hoy's testimony as to his business dealings with decedent to be credible. Mr. Hoy gave the [Orphans'] Court no reason to question the provenance of the exemplars (R-2) pulled from his legal files. None of the testimony adduced on cross-examination about the exemplars gave the [Orphans'] Court pause as to the authenticity of his testimony regarding his interaction with decedent, or his factual assessment of the signature's authenticity based on his years of experience as counsel. Mr. Hoy did not hedge or attempt to parry with

[Appellant's] counsel in acknowledging how signatures may change over time or may differ based on the angle at which a signature is made. As to the issue of decedent's signature, [the Orphans' Court] found Mr. Hoy's testimony to be sound and credible.

Orphans' Court Opinion, filed 12/15/23, at 6-7 (quotation marks and quotation omitted).

Moreover, in its Rule 1925(a) opinion, the Orphans' Court relevantly explained:

[Appellant] alleges that the [Orphans'] Court erred by failing to [reconsider] the credibility of Richard Hoy, Esquire, who testified about the authenticity of decedent's signature of the [April 17, 2021,] Will. [Appellant] contends that the [Orphans'] Court should have [found] that [Mr.] Hoy was [not] a credible witness as to the signature's authenticity because newly acquired evidence [allegedly] contradicts [Mr.] Hoy's representation to the [Orphans'] Court that the Estate property, located at [****] N. 3rd Street…had not been listed for sale.

[The Orphans' Court] correctly declined to reconsider [its] credibility ruling in the November 16, 2023, ruling on the basis of documents and information that existed outside the record in this case.

The [Orphans'] Court had found Mr. Hoy's testimony as to his business dealings with decedent to be credible.

***

[The Orphans' Court] gave [Mr.] Hoy's testimony regarding decedent's signature the appropriate amount of weight. While [the Orphans' Court] has concerns about the alleged falsity of [Mr.] Hoy's assurances to [the Orphans'] Court about the listing status of the Estate property, [the Orphans' Court] did not consider the issue relevant to the analysis and disposition of this Will dispute.

Orphans' Court Pa.R.A.P. 1925(a) Opinion, filed 5/6/24, at 17-18 (footnote omitted).

We conclude the Orphans' Court did not abuse its discretion in denying Appellant's claim. *In re Estate of Smaling*, *supra*. We note the Orphans' Court, as the trier of fact, was free to determine the weight to be given to each witness's testimony. Furthermore, the Orphans' Court was free to determine what impact, if any, Mr. Hoy's alleged misrepresentation about the sale of estate property had on his testimony regarding his familiarity with decedent's signature and whether he recognized the signature purporting to be that of decedent on the April 17, 2021, Will.

Appellant requests that we re-weigh the evidence and assess the credibility of the witnesses presented at trial, we decline to do so as it is a task that is beyond our scope of review. *See id.* Accordingly, we find no merit to Appellant's claim.

For all of the foregoing reasons, we affirm.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 12/24/2024

- 30 -